<pre>
 1                 IN THE UNITED STATES DISTRICT COURT

 2                        DISTRICT OF UTAH

 3                       CENTRAL DIVISION

 4

 5   UNITED STATES OF AMERICA,     )

 6            Plaintiff,           )

 7      vs.                        )   Case No. 2:22-CR-160-JNP

 8   CLINTON CHUKWUDI UCHENDU,     )

 9            Defendant.           )

10   _____)

11

12           BEFORE THE HONORABLE JILL N. PARRISH

13        ----------------------------------------

14                    December 5, 2023

15                    Daubert Hearing

16

17

18

19

20

21

22

23

24   REPORTED BY: Patti Walker, CSR, RPR, CP    385-215-5889

25   351 South West Temple, #8.431, Salt Lake City, Utah  84101
</pre>

```
1                      A P P E A R A N C E S

2

3   For Plaintiff:                Carl David LeSueur
                                  Stewart M. Young
4                                 U.S. ATTORNEY'S OFFICE
                                  111 South Main Street
5                                 Suite 1800
                                  Salt Lake City, Utah  84111
6

7   For Defendant:                Sam Meziani
                                  GOEBEL ANDERSON PC
8                                 405 South Main Street
                                  Suite 200
9                                 Salt Lake City, Utah  84111

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              I N D E X

2     Witness                  Examination By              PAGE

3     Uzoma Eze                Mr. Meziani  (Direct)           6

4                              Mr. Young  (Cross)             37

5                              Mr. Meziani  (Redirect)        80

6                              Mr. Young  (Recross)           81

7

8     Exhibits Received into Evidence:

9     Defendant's 1                                           7

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1      SALT LAKE CITY, UTAH; TUESDAY, DECEMBER 5, 2023; 1:00 P.M.
 2                            PROCEEDINGS
 3              THE COURT:  Good afternoon.  We're here in the
 4      matter of the United States of America vs. Clinton Uchendu.
 5      The case number is 2:22-CR-160.
 6              We're here to conduct an evidentiary hearing in
 7      connection with the government's motion for a Daubert
 8      hearing to exclude the testimony of Uzoma Eze.  I don't know
 9      if I'm pronouncing that correctly.  But let's begin by
10      having counsel enter their appearances, please.
11              MR. YOUNG:  Stewart Young and Carl LeSueur for the
12      United States.
13              MR. MEZIANI:  Good afternoon, Your Honor.  Sam
14      Meziani for Clinton Uchendu, who is present via Zoom.
15              THE COURT:  And I have to confess, counsel, I'm
16      completely discombobulated because you're sitting at a
17      different table from where you're typically seated, but
18      that's okay.
19              MR. MEZIANI:  That's my fault.  I'm sorry.
20              THE COURT:  That's okay.  I guess I really don't
21      care, but I'm just looking the wrong direction.
22              Well, I think what makes sense -- the government
23      had requested an evidentiary hearing.  Mr. Meziani, I think
24      you also indicated that you thought it would be very helpful
25      to me to actually hear your expert testify before I ruled on
```

1    the motion.  So it looks like your expert is here and you're

2    free to proceed.

3              I think we should also indicate for the record

4    that Mr. Uchendu is joining us via Zoom.

5              Is that right, Mr. Uchendu?

6              Can you hear me?

7              MR. UCHENDU:  Yes, Your Honor.

8              Can you hear me?

9              THE COURT:  Yes, we can hear you.  And I'll try

10   and keep my eye open on the screen and make sure that you're

11   still with us.  If for some reason you lose sound or for

12   some reason you were to be cut off, hopefully you've got a

13   cell phone number where you can contact Mr. Meziani and

14   we'll do what we can to hook you back up.

15             MR. UCHENDU:  Thank you.  I appreciate it,

16   Your Honor.

17             THE COURT:  You may proceed, Mr. Meziani.

18             MR. MEZIANI:  Thank you, Your Honor.

19             Defense calls Uzoma Eze.

20                        UZOMA EZE,

21          Having been duly sworn, was examined

22               and testified as follows:

23             THE COURT:  And, counsel, let me just indicate,

24   before you jump in, that as I've given some thought to how

25   we should proceed, I think you should just go through

1   whatever you want to put into evidence, Mr. Meziani.  The

2   government, I guess you can cross-examine if you want to.

3           I would think that after we finish with this

4   process, it would make sense for the government then to

5   articulate any evidence that it wishes to exclude,

6   particularly given the fact that we've got a new Rule 702 of

7   evidence in place that wasn't in place at the time of the

8   prior briefing.  Also at the time of the prior briefing, we

9   weren't sure as to the precise nature of the testimony.

10           I will then give you a chance to respond,

11   Mr. Meziani, and then I'll rule.  But if you have objections

12   to that procedure, let me know.

13           MR. YOUNG:  That's fine, Your Honor.

14           THE COURT:  Is that okay with you, Mr. Meziani?

15           MR. MEZIANI:  Yes, Your Honor.  Thank you.

16           THE COURT:  Okay.  You may proceed.

17           THE CLERK:  Please state your name and spell it

18   for the record.

19           THE WITNESS:  Uzoma Eze.  That's U-z-o-m-a, first

20   name.  Last name, E-z-e.  That's echo, zulu, echo.

21                   DIRECT EXAMINATION

22   BY MR. MEZIANI:

23   Q    Good afternoon, Mr. Eze.

24   A    Good afternoon, Sam.

25   Q    Before we talk about your opinions, I want to discuss

1   your qualifications for a moment and I'm going to hand you

2   Exhibit 1.

3                MR. MEZIANI:  Your Honor, this is the expert

4   disclosure with the resume.

5                THE COURT:  All right.

6   BY MR. MEZIANI:

7   Q    Sir, if you would please turn to the back page.

8        Is that your resume on the back?

9   A    Yes, it is.

10               MR. MEZIANI:  Defense offers number one.

11               THE COURT:  It's received for purposes of this

12   hearing.

13               (Defendant's Exhibit 1 was received into

14   evidence.)

15   BY MR. MEZIANI:

16   Q    Let's just go over a few items in your resume.

17        You're a certified public accountant?

18   A    Yes, I am.

19   Q    And when did you receive that certification?

20   A    2001.

21   Q    What was your undergraduate degree?

22   A    Accounting.

23   Q    And where did you attend undergrad?

24   A    Norfolk State University in Virginia.

25   Q    I see you're a lawyer.  Where did you attend law

1    school?

2    A    Fordham University in New York City.

3    Q    And where did you work after law school?

4    A    After law school I went to a firm in New York called

5    Shearman & Sterling.

6    Q    And what type of work did you do at that firm?

7    A    Corporate work, M&A, capital markets, tax,

8    securitizations and derivatives.

9    Q    Thank you.

10        And you started your own firm in 2008, correct?

11   A    Correct.

12   Q    What type of work do you do with your own firm?

13   A    General practice at the time, mostly civil, and it's

14   graduated.  It's become a lot of things over the years.  Now

15   focused on regulatory compliance, tax, and white-collar

16   defense.

17   Q    And are you also involved in international transactions

18   with your current firm?

19   A    Yes, I am.  Currently a lot of my clients are

20   businesses that transact between Nigeria, which is where I'm

21   born and my country of origin, and the United States.

22   Q    So you're familiar with financial transactions

23   involving the United States and Nigeria?

24   A    That is my specialty, correct.

25   Q    Just going back, where have you worked as an

1 accountant?

2 A I worked at a company called Ernst & Young.  Back in

3 the days they were known as the Big 5 accounting firms.

4 That was in New York City.

5   And then after that I left and went to Verizon

6 Communications and worked at Verizon Wireless and launched

7 Verizon Wireless product, but specifically as a derivatives

8 and hedging accounting policy person.

9 Q Have you ever worked in fraud compliance as an

10 accountant?

11 A Fraud compliance as an accountant --

12 Q Fraud investigations.

13 A Yes -- well, not with Ernst & Young, but on my own I've

14 had to do forensic audits for clients on their financials to

15 detect fraud.

16 Q Tell me what a forensic audit entails.

17 A Well, the range is pretty wide, but what you're trying

18 to do is look at financial statements.  So you look at

19 balance sheets, cash flow statements, income statements and

20 try to determine year to year, period to period anomalies or

21 things that would seem to indicate that something is off.

22 You tie the financials to the bank statements.  You vouch

23 the bank statements personally.  If there's an inventory

24 issue, you physically count inventory, or sample inventory

25 just to make sure that what's reflected on the financial

1     statements is what's reflected in the bank accounts and the

2     inventory schedules.

3     Q     Thank you.

4           And is that something you're paid to do as part of your

5     profession?

6     A     Yes, I am.  Yes.

7     Q     You're also a founder of a business, correct?

8     A     Yes, I am.

9     Q     Can you please tell the Court what business you

10    founded.

11    A     October 14th, 2020, I founded a digital money service

12    business called AideMoney.  The A-i-d-e stands for Africans

13    in diaspora engagement.  I had a vision of making transfers

14    of value and money between the United States and Africa much

15    cleaner, much more efficient, more reliable, and cheaper.

16    And I built that company as a digital technology platform,

17    and you can send money through apps on Apple and Android,

18    and also Web based.

19          It's a licensed money service business, so it holds

20    state licenses to be able to move funds for people between

21    the United States -- 50 states, and specifically, for right

22    now, Nigeria, Ghana, Cameroon, Kenya, and Ethiopia.

23    Q     When you were explaining the title of the company, you

24    said diaspora.  Why did you choose that word to be in the

25    title of your company?

1    A    Well, it's kind of my mission.  I'm a member of the

2    African diaspora.  There's about 40 million of us living in

3    the U.S. right now.  And I'd always thought that it makes

4    sense that people -- those of us who no longer can live in

5    Africa, for whatever reason, but live in America and still

6    have African identity should be able to think together and

7    work together towards kind of -- because, you know, we're

8    Americans now.  There's 40 million of us.  And we're also

9    Africans.  So I thought that would be a perfect way to

10   connect the two countries.

11        And moving money back and forth was just one of the

12   first issues I detected for my law practice because I saw

13   that that was a big problem that was leading to a lot of

14   incarceration, bank closures, asset forfeitures.  The

15   community was suffering -- the good guys were suffering and

16   the bad guys were getting away mostly scot-free.  So I

17   wanted to have a business where I could take a stab at fraud

18   and mitigate fraud in that pipeline because I figured who

19   can do it better than somebody who lives half of his life in

20   America and the other in Lagos or parts of Nigeria and knows

21   people on both ends and transacts with people on both ends

22   and is very intimate and hyperlocal with these issues.

23   Q    Thank you.

24        I want to go back to something you said earlier and

25   talk about -- you were talking about the number of Africans

```
1   living in the United States.  Can you explain your knowledge
2   about maybe the scope of financial transactions between
3   Nigerians in America and Nigerians in Africa?
4   A    The research that I had to do to launch the company
5   paid research, very expensive stuff, but what came back
6   was -- at least in 2020, or the year before COVID, Nigeria
7   had sent -- Nigerians living abroad had sent $24 billion to
8   Nigeria, and that was on the official -- through the
9   official channels, money service businesses, Western Union,
10  MoneyGram, the likes -- AideMoney.  But the research also
11  came back as yet another 24 billion, at least, was going
12  through the parallel market.
13       So you're looking at close to $50 billion going from
14  Nigerians living abroad to a Nigerian annually.
15  Q    I want to distill that.  You talked about official
16  money transfers, correct?
17  A    Correct.
18  Q    And then you used the term parallel market?
19  A    Yes.
20  Q    That's obviously an important term in the disclosure.
21  Can you please explain what you mean when you use the term
22  parallel market?
23  A    Parallel market, the best way to think about it is
24  Nigerians have -- okay.  So most of us living in a diaspora
25  actually keep Nigerian bank accounts.  So most of us.
```

1    Q    And why is that?  Why would someone -- a Nigerian

2    American living in an American city, why would someone like

3    that keep a Nigerian bank account?

4    A    Well, the definition of a Nigerian in diaspora is a

5    dual existence.  We have homes here and homes there.  We

6    have businesses here, businesses there, families here,

7    families there.  So your need to move money back and forth

8    between your two domains, your two homes as it were, it's

9    constant.  It's almost a weekly -- at least a monthly

10   endeavor for most people in the community.  So it just make

11   so much more sense to have an account there as well as an

12   account here, just like you would if you lived here.  Of

13   course when you're over there visiting or working, you have

14   the account to work from.  You have your debit cards in your

15   pocket.  Online banking makes it possibly to do all kinds of

16   stuff now.  So that's typically what you see.

17        So when people have those -- an American -- a Nigerian

18   American living in Houston also has a fidelity bank account

19   for his naira transactions.

20   Q    Can I stop you right there?  Naira --

21             THE COURT REPORTER:  Could you please slow down?

22             THE WITNESS:  The Nigerian local currency is

23   called the naira, n-a-i-r-a.

24   BY MR. MEZIANI:

25   Q    Okay.  So a Nigerian American living in the U.S. might

1   have accounts in Nigeria and those are naira based accounts,

2   correct?

3   A     Yes.

4   Q     And --

5   A     And dollar.

6   Q     I'm sorry?

7   A     And dollar.  Those banks allow you to have naira

8   denominated accounts and dollar denominated accounts.

9   Q     Are there any restrictions in Nigeria regarding the

10  ability to transfer naira into dollars?

11  A     It's notoriously difficult.  Part of the problem is

12  that the country and those parts of Africa are under endemic

13  corruption.  It's the kind of corruption that stifles

14  innovation at every point.  And one of the things that

15  happens is, for instance, the Nigerian Central Bank has --

16  at least as of last year had four different exchange rates.

17       So what that means is that if you went to the bank and

18  said, hey, I want to buy dollars, depending on who you are

19  and who you know, the price for $1 could be anywhere from

20  400 naira to a dollar to 900 naira to a dollar.

21       So what happens is the most favored people, the most

22  connected people are able to buy it at 400 and immediately

23  go on the parallel market and sell it, and make almost a

24  hundred percent on their money without ever leaving their

25  homes.

 1        So it became such a racket, and what it did was it also

 2   dried up the availability of dollars in Nigeria.  Nigeria is

 3   an oil producing country.  On paper produces a lot of oil

 4   and sells a lot of oil, but a lot of it is lost to

 5   corruption.  And even then the dollars are carted away by

 6   really, really bad people.  So there isn't any dollars left

 7   in the country.  That's what I'm trying to say.

 8   Q    I'm sorry.  Could you repeat the last thing you said?

 9   A    There aren't that many dollars left in the country's

10   coffers.  So when you go there looking for dollars,

11   regulatorily it's a nightmare, but even physically speaking

12   there are no dollars to give you.

13   Q    You were talking the parallel economy earlier.  How

14   does the difficulty in getting dollars in Nigeria relate to

15   the parallel economy you mentioned?

16   A    Nigerians consume mostly American products, especially

17   when it comes to automobiles.  Almost 90 percent of the cars

18   you're going to see on Nigerian roads are bought here in the

19   U.S. as used cars.

20        Nigerians want to send all their children to come to

21   college here.  And Nigerians always want to vacation in

22   Hawaii, California, that type of stuff.

23        Nigerians consume a lot -- they consume mostly American

24   products and services, including vacations, education for

25   their kids, clothing, and cars.  Okay.  And a lot of them

1    want to invest their dollars in the U.S. or put money in a

2    bank account in the U.S., or at least store their value in

3    dollars, because the Nigerian naira depreciates so suddenly

4    and so fast that they don't want to put their income in

5    naira.

6         So there's a lot of demand for getting money into the

7    U.S. or for getting cars from the U.S.  But the problem is

8    you can't take your naira on a plane and come and change it

9    at a bureau exchange or a Travelex booth because naira has

10   no value outside of Nigeria.  But at the same time if you

11   went to the bank, there were only certain categories of

12   people who could get that dollars.  You had to be a

13   businessperson who was buying heavy equipment for their

14   business or you were sending your kids to college.  And even

15   then there were limitations on the amounts.

16        It can get crony agents to who you know, and the

17   process could take sometimes up to several months just to

18   get your hands on $30,000 for a vacation, or to buy a Toyota

19   Camry in the United States.

20   Q    Okay.  So we talked about the desire of people in

21   Nigeria for dollars.  Looking at people in the U.S., members

22   of the diaspora you mentioned, have you seen in your career

23   and practice that people in the U.S. also have financial

24   interests in Nigeria?

25   A    Yes, and I'll give you an example with myself.  Okay,

1    Nigeria, 215 tribes, and these tribes are different in

2    language, cuisine, dressing, the whole nine -- religion.

3    215, different.

4        My tribe is one of the major ones.  We're called the

5    Igbo.  An Igbo man is required, as part of his rite of

6    passage, to own a home in his ancestorial village.  So

7    you're talking about out in the country, no power, no water,

8    nothing.  Just build yourself a mansion and that becomes --

9    that becomes you are now a man.

10       So most Igbo men in America have a home.  They spend

11   100,000, $200,000 to put up this massive edifice that no one

12   lives in and probably no one is ever going to live in for

13   the rest of their lives.  And all of us -- most of us do it.

14   So there is a need for that.

15       Now we also --

16   Q    Let me stop you there.  So building a house.  Is there

17   also -- do Nigerian Americans in the United States also

18   support family members at home in Nigeria?

19   A    It is a requirement.  You are in America.  You've been

20   blessed.  You have to support someone.

21       So is it grandma, is it grandpa, is it cousins,

22   nephews, workers, whatever?  There's always somebody who

23   depends on you for support, and the question is how many.

24   And that's generally the case for most members of the

25   community.  Very few exceptions to that.

1  Q    Okay.  So going back to the fact that we have people in

2  Nigeria who want dollars and people in America who want to

3  send money to Nigeria, given those two factors, can you

4  maybe give us an example of what a transaction would look

5  like in the parallel economy?

6  A    I'll use cars as an example because that's one of the

7  main ones.

8       A Nigerian just got a promotion and his promotion --

9  especially if you're a banker and you make certain years in

10 the bank, they'll give you an auto allowance, and it would

11 be the equivalent of, say, $20,000, but it's in naira, and

12 you're told to go get yourself a car.  So you have $20,000

13 worth of naira.  Let's just say it's 20 million.  That's

14 right around what it is right now.  It's about a thousand

15 naira to $1.  So $20,000 is 20 million naira.  So you get

16 20 million naira and you're told go get a car.

17      Now there's no way to take your 20 million and go to

18 the Central Bank or to any bank and get dollars for the

19 reasons I've just explained.  So what typically happens --

20 because we really do live as a close-knit community, we all

21 talk to each other all the time.  WhatsApp groups are huge

22 in the Nigerian communities.  I belong to maybe -- I make

23 contact with about several hundred people daily.

24      So what happens is the person in Nigeria says, hey,

25 guys, talk to a relative, a friend, someone they know, and

1    they say, hey, I've got my bonus and I need to buy a Toyota

2    Corolla, 2020.  Does anybody have a need for 20 million

3    naira in Nigeria right now so that I can pay this 20 million

4    naira into their account, and then they'll fund the $20,000

5    into my U.S. account, or my designated account, say, the

6    dealer's account.  And by the time they make one or two or

7    three calls, they're going to find somebody who has a need

8    for naira, and that's when that parallel market happens.

9         So usually what you hear is, okay, move position.  So

10   he goes, he takes his 20 million and he puts it into, say,

11   you know, the American person's Nigeria naira account.  As

12   soon as he makes that deposit, an alert shows up on your

13   phone here in the U.S., because everyone is connected now.

14   Nigerian bank alerts are instant.  The 20 million goes in.

15   He sees an alert on his phone.  A 20 million naira credit.

16   He goes to Wells Fargo and puts the $20,000 into that

17   guy's -- either his account or the designated -- say the car

18   dealer's account.  That would be a typical parallel

19   transaction.  That happens quite often.

20             THE COURT:  Are there cars available in Nigeria

21   that you can purchase using naira?

22             THE WITNESS:  Yes, and they all came from the

23   U.S., Your Honor.

24             So the idea is you can buy -- so the American

25   economy has really reacted to the Nigerian demand and

1    created these dealerships that people can get online and bid

2    on cars from Nigeria.  They look at a car, and they bid it,

3    and they win it.  And once they win it, they have ten days

4    or five days to show up with the cash and take the car, put

5    it on a ship and send it to Nigeria.

6              THE COURT:  So just to be clear then, the folks in

7    Nigeria who want to buy an American car are buying them from

8    American dealers in the U.S. and then having the car shipped

9    to Nigeria?

10             THE WITNESS:  Or buying it directly for

11   themselves.

12             And yes, your question was are there dealers in

13   Nigeria that sell those same cars?  Absolutely.  But given a

14   choice, the person would typically want a car that they know

15   its precedent, and attestment, and everything about it.  So

16   they'll try to buy it directly.  That's the most favorite

17   way of buying cars.  And it tends to be cheaper.  So I

18   should say that.

19   BY MR. MEZIANI:

20   Q    Thank you.

21        So that's an example of a parallel transaction -- or a

22   transaction in a parallel economy.

23        Since this is a Daubert hearing, we need to talk about

24   how you know this.  So my question is when did you first

25   become aware that there was this informal economy between

1  the U.S. and Nigeria?

2  A    I guess you could say I've always been aware, but

3  really coming to that awareness was when I started

4  practicing law on my own in 2008.  I started a young family,

5  and a request -- because people kind of leave you alone when

6  you're in college and when you're kind of working through

7  your degrees.  But when you start working and you're

8  recognized as an earner, the requests for help start to come

9  in.  You know, grandma's food, grandma's feet, grandma's

10  shoes.  So I would say about 2008 when I had just started my

11  solo is when I really got into it.

12      And around that time the banking industry in Nigeria

13  did a jump to technology.  It went from paper to technology.

14  So doing transactions from the U.S. became significantly

15  easier.  That's when I realized that that market had to be.

16  That's when I came to awareness.

17          THE COURT:  So when did you first come to the

18  United States?

19          THE WITNESS:  1994, Your Honor.

20          THE COURT:  And you were how old then?

21          THE WITNESS:  I was 19 years old.

22          THE COURT:  So you came for college?

23          THE WITNESS:  I was in college in Nigeria, yes,

24  and I was in my second year of law school in Nigeria.  When

25  I came to America I realized that I had to do another

1    undergrad to be able to continue law school.  That's how I

2    became an accountant.

3            THE COURT:  Okay.  So did you then just do the

4    final year of law school in the U.S. or did you have to

5    start over?

6            THE WITNESS:  I actually went back to first -- a

7    freshman, and did four years of accounting.  Worked as an

8    accountant.  Got my CPA.  Worked for a while.  And then went

9    back to law school, and did that too, and then came out as a

10   lawyer.

11   BY MR. MEZIANI:

12   Q    Mr. Eze, do you have any data or information on the

13   extent of this informal economy between Nigeria and the

14   United States?

15   A    Besides the statistics I quoted on the 24 billion?

16   Q    Maybe we'll just go over it again.

17        I think you mentioned data on official transactions.  I

18   just want to make sure -- I want to ask you if you have any

19   data or information on the scope of this informal economy,

20   if you haven't answered it already.

21   A    The only data I have is the one I told you I got from

22   the research I did when I was founding AideMoney, and there

23   was research that I paid for, and it brought out that

24   statistic that 24 billion was the initial market.  Another

25   24 billion, at least, was on the parallel market.

 1           But anecdotically in the community, because of the

 2     position I hold in the community, it's every day, it's every

 3     way, it's all the time.

 4           THE COURT:  Do you recall who you paid to do this

 5     research?

 6           THE WITNESS:  Panjiva?  No, it wasn't Panjiva.

 7           It's somewhere on my phone.  If I go digging, I'll

 8     find it.

 9           It was Intelligent Insider.

10           THE COURT:  And do you know, did they have

11     published research on this or did they do the research

12     simply at your request?

13           THE WITNESS:  No.  It's published research that

14     you have to pay for.  So it's out there.  You can Google it

15     and read the highlights of the report.  And if you want to

16     get into the details of it, you have to pay them.  I believe

17     it was 5,000 pounds.  They're an outfit out of London.

18     BY MR. MEZIANI:

19     Q    So, Mr. Eze, in addition to that data, I want to talk

20     about your personal experience.  Can you tell the Court what

21     your personal experience has been with this informal

22     economy, whether it's transactions on your own or advising

23     people?  Just what's your overall personal knowledge of this

24     economy rather than maybe coming from this intelligence

25     data?

```
 1   A     Well, I -- again, like I explained, I straddle a unique
 2   position in the community because of my professional
 3   experience and my background.  I'm almost as American as I
 4   am Nigerian at this point.  I came at 19, and I'm 48 years
 5   old right now.  And I spend a lot of time in both places.  I
 6   spend a lot of time in Nigeria.
 7         If you look at it, as an attorney in my community where
 8   we don't have that many attorneys who are -- well, we have a
 9   lot of attorneys, but not as many, and because my practice
10   area was always in finance, in fraud mitigation, and those
11   kinds of things that not a lot of people were doing, people
12   always find their way to my office with these kinds of
13   questions, and that's as an attorney.  And also defending
14   these cases in court as an asset forfeiture lawyer.
15         But a lot of my experience also comes from -- so
16   there's the community part, there's the law part, and
17   there's AideMoney that I built to solve the exact problem of
18   these fraudulent conveyances that were just ripping through
19   the community.
20   Q     Let me stop you there.  How would AideMoney solve that
21   problem of fraud?
22   A     Because I looked at the solutions that the other
23   companies, MoneyGram, Western Union, TransferWise, were
24   putting out there, and the solutions were not fully thought
25   out.  They didn't take into consideration the native
```

1    intelligence and the hyper-locality of Nigerian criminal

2    behavior, something that I felt that with my position I

3    could study and be better at.

4         One of the things I noticed was all of the focus on the

5    U.S. on fraud prevention was on sender.  It was validating

6    the sender to make sure that that is a valid sender.  Well,

7    what I realized is one way to solve this problem, or the

8    other end of the equation is the recipient.  These people,

9    when they finish laundering money in the U.S., they send it

10   to a bank account that is one of them or their cronies.

11        So if you can flag an identified account in Nigeria, in

12   Nigerian banks in naira that are bad accounts, you have an

13   additional layer of fraud prevention to add on top of what

14   we do in the U.S., which is typically just send a

15   validation.

16        So we're looking at processes where sender validation,

17   yes.  Add recipient validation.  I can look at a sender and

18   say, yeah, he looks good.  But knowing that this is going to

19   a bad person, I can almost tell you, for instance, this

20   person could be a mule, because they don't know that this

21   money is ending up in a bad guy's hands.

22        So these were some of the ideas that we would bring in.

23   We didn't see anybody else doing it.  So we figured we would

24   add that as another layer of fraud litigation.

25   Q    Do you actually do any of those steps that you just

1  outlined?

2  A    We're working on them.  It's very expensive.  But we

3  have a team in Lagos right now who is a fraud -- we call it

4  a fraud behavioral unit.  So it's customer service and fraud

5  behavioral unit.  And what they do is go out into the

6  community and try to embed with some of these sales of bad

7  guys, follow them around, collect data on them, just any

8  kind of data that we can get on these people to understand

9  their behavior, where they bank, who they bank with, the

10 kinds of things that would allow us to behaviorally identify

11 a criminal on a transaction before the money gets into their

12 hands so we can stop it before that happens.

13 Q    Thank you.

14      I want to move on to -- start talking about this case.

15 You reviewed documents in this case, correct?

16 A    Yes, I did.

17 Q    And can you tell the Court the kinds of documents you

18 reviewed?

19 A    I reviewed a lot of communications between the

20 defendant and some of the alleged co-conspirators, some

21 documents regarding pictures of a car that was apparently

22 sold or purchased, or up for sale or purchased.  But it was

23 mostly communications and, of course, the indictment.

24 Q    Did you meet with the defendant, Clinton Uchendu?

25 A    Yes.  I met with him in Atlanta.  I believe it was

1    summer, May, thereabouts, this year.

2    Q    And what was the purpose of the meeting?

3    A    I had -- after I had been approached to do my expert

4    work on the case and looking at the files, I had a certain

5    opinion of the case, but I expressed to counsel that I felt

6    that a face-to-face with this person would tell me a lot

7    more, kind of fill in the gaps in my knowledge.  So I asked

8    for it and it was granted.

9    Q    And during that meeting did you, in fact, ask

10   Mr. Uchendu questions?

11   A    Yes.  I spent -- I believe it was about an hour and 15

12   minutes asking him direct questions.

13   Q    And did the answers to those questions help form your

14   opinions here today?

15   A    Yes, they did.

16   Q    Now I want to just go through -- there's a notice of

17   expert disclosure which kind of outlines your opinions in

18   four really broad categories, and I would just like to go

19   through some of those opinions.

20        The first is there's a legitimate parallel market.  Was

21   that the informal market we were talking about earlier?

22   A    Yes.

23   Q    And is it common for ordinary, law-abiding citizens in

24   the United States, or a Nigerian, to engage in these types

25   of transactions?

1  A     Yes.

2  Q     Anyone --

3           THE COURT:  And when you say legitimate, is that

4  intended to express a legal conclusion about everything that

5  happens in the parallel market?

6           THE WITNESS:  I wouldn't go as far, Your Honor.

7  All I can say is that the majority of the transactions are,

8  for instance, between family members and friends who have

9  matching needs.  It would be almost like a barter, which

10 there is no law against, as far as I know.

11 BY MR. MEZIANI:

12 Q    I just want to be clear on that point.  Mr. Eze, you're

13 not opining on whether any of these -- or I haven't asked

14 you to render an opinion on whether any of these Nigerians

15 in the U.S. who engage in these transactions do or do not

16 have to comply with any licensing rules, right?

17 A     You haven't asked me.

18 Q     And you're not rendering an opinion on whether,

19 generally speaking, these types of transactions between

20 friends and family members, and so on, whether those need to

21 comply with any licensing rules?

22 A     I am not.

23 Q     Putting that aside, is it common for Nigerians in the

24 United States to engage in these informal transactions?

25 A     It is extremely common.  It would be the exception that

1    people do not.

2    Q     Now when you started AideMoney, you're aware that

3    there's fraud in the Nigerian community, correct?

4    A     Yes.

5    Q     You said that's one of the reasons you started the

6    company?

7    A     Yes.

8    Q     Your second opinion is that criminals, the Yahoo Boys,

9    take advantage of these informal transactions; is that

10   correct?

11   A     Yes.

12   Q     And can you explain, first of all, how you know this?

13   How do you know that bad guys come in and take advantage of

14   these informal transactions?

15   A     My practice over the past seven years has,

16   unfortunately, devolved into just that.  I would say over

17   the past seven years, 75 percent of my work has been related

18   to that.  And that wasn't by choice.  It just happened to be

19   the calls that came into the office.

20        So on that side, that's where most of my information is

21   coming from.  But then I tacked on AideMoney, and then I

22   became a victim, if you would, of the fraud, because in our

23   first two months of operation, we got hit with almost

24   $55,000 worth of fraud.  And we were a brand new company,

25   thinly capitalized.  It almost bankrupted us.

1        I was able to see it as an attorney defending, but also

2   as a businessperson whose business depended on the ability

3   to tell the difference between a good guy and a bad guy on

4   each transaction.

5   Q    So currently as a business owner, you have an interest

6   in detecting fraudulent transactions, correct?

7   A    I would say that's the number one interest.  The money

8   transfer of business has been around for many years.  It's

9   not difficult.  The challenge is the fraud.  Sending money

10  to sub-Saharan in West Africa costs about nine percent.

11  Sending money to India is about two to three percent.  That

12  entire delta is related to fraud losses.

13       And then the limits for sending are so small -- it's

14  $2,999 is the limit for sending dollars from the U.S. to

15  Nigeria.

16  Q    That's the limit for your company?

17  A    That's the limit for my company, and most companies

18  actually.

19            MR. YOUNG:  I didn't catch that.  $999 is the

20  limit?

21            THE WITNESS:  2,999.

22            MR. YOUNG:  Got it.  Thank you.

23            THE WITNESS:  And so what we see is it was just a

24  corridor of money.  A lot of money needed to move.  People

25  are buying and building houses for $200,000, $300,000, and

1    they can only move 2,999.  So the parallel market almost had

2    to exist because there just really wasn't a structure for

3    moving those kinds of money.  And it's always been there,

4    people have always used it, and that's the nature of the

5    parallel market.

6          So when we created AideMoney, the idea was, okay,

7    can we build technology, build compliance, and build

8    knowledge around a product that increasingly expands the

9    bandwidth of the amount of money that can be sent between

10   the U.S. and Nigeria through formal channels and still

11   avoiding the fraud problem.

12         So the fraud was really the problem that needed to

13   be solved, because having your pipeline send $500,000 is

14   easy.  It's the same as sending $500.  It is that on a $500

15   transaction, if it's fraud, you can recover from it.  You

16   can pay the guy back the $500.  But if you let $500,000 slip

17   through your pipeline and it turns out to fraud, how are you

18   going to refund that?

19         The typical send amount is somewhere between 200

20   and $500 through the formal channels.  The maximum for most

21   formal channels is 2,999.  So when you are sending $500,

22   it's through the same finance pipeline.  It's as easy as

23   sending 500,000.  The only difference is if you send 500 and

24   it goes bad, you owe someone 500 as a charge back.  If you

25   did $500,000, you could lose the shop.

```
 1              So if we're able to clean up that fraud, there's
 2   nothing preventing us from making it possible to move the
 3   amounts of money that need to be moved so that things don't
 4   go to the parallel market, because it's on the parallel
 5   market that we see a lot of the problems with fraud, with
 6   people having their money taken from them, and people being
 7   caught up as mules, and all those kinds of things.  The
 8   legal -- the bad legal implications come on the parallel
 9   side more so than on the formal side.
10              THE COURT:  So does AideMoney have a limit?
11              THE WITNESS:  2,999.
12              THE COURT:  So that's the limit you've imposed.
13   Okay.
14   BY MR. MEZIANI:
15   Q    Mr. Eze, through your involvement with AideMoney and
16   being a member of the Nigeria diaspora, and just your
17   business, have you become aware of the various scams that
18   are out there?
19   A    Yes.  And I don't know --
20   Q    Stop right there.
21              So how have you become aware?  If there's a scam out
22   there, how do you become aware of it in your work?
23   A    Well, I have a team in Lagos that reports to me on the
24   latest scams, what they're called, and what they involve.
25   But I also research fraud.  My LexisNexis subscription is
```

1    fully fraud based.  A lot of my research engines in the U.S.

2    are on fraud, and I research and write about fraud

3    litigation, and I make YouTube videos and blog about that

4    all the time.

5    Q    I want to talk about some of the communications that

6    you reviewed.  Your report states that you reviewed

7    communications between an alleged co-conspirator Ken and the

8    co-defendant Princess Eziyi.  Some of those communications

9    used terms like stupid boy and ur boy.  Can you explain to

10   the Court the significance of those terms when you were

11   looking at this evidence?

12   A    Yes.  That's an interesting one because these --

13   Nigerians, because of the number of languages I told you are

14   spoken, we speak pidgin as a common language.  Pidgin is

15   also called broken English.  So this is Pidgin speak when --

16   those WhatsApps, when they were communicating, they were

17   communicating in Pidgin.  And the boy is an interesting one

18   because like in America in the black community you say, hey,

19   that's my boy.  That means that's my guy.  But in the

20   Nigerian context, especially when you say ur boy, what

21   you're trying to say is I don't know that person.  You

22   introduce them to me.

23        So when I saw ur boy, that said to me that -- I think

24   it was Ken speaking to Princess and saying what's up with ur

25   boy.  That means that Ken is saying I don't know this guy.

1    He's you.  You brought him to me.  So what's up with ur boy?

2    Q    Mr. Eze, in your work and experience, have you seen

3    instances in which bad guys, Yahoo Boys, whatever you want

4    to call them, take advantage of others in the Nigerian

5    diaspora to move money?

6    A    Yeah, absolutely.

7    Q    Is that common?

8    A    Overwhelmingly the case.

9    Q    And can you please explain how you know that and why

10   that's your opinion?

11   A    How do I know that?  Again, my involvement in the

12   community, my legal practice, AideMoney, all of these

13   things.  But, you know, I was thinking about -- I'm legal

14   counsel to the Igbo Catholic community in Houston.  That's a

15   thousand plus people of my tribe who are Catholics.  I'm

16   legal counsel and a member of that.

17        I have got 20 first cousins who all moved from Nigeria

18   with me to the U.S., and I've got 48 in Nigeria, and we're

19   all together on a WhatsApp group.  We're very close.

20        I've got 500 different students from elementary school,

21   to my high school who are on a WhatsApp group with me right

22   now.

23        I am a member of the Nigerian Lawyers Association.  I'm

24   a member of my village council in Houston.  A hundred plus

25   families in Houston, I am on the leadership.  I have homes

1    in Lagos, Warri, and Houston.  I have offices in Lagos,

2    Houston, and New York.

3         So my involvement in the community -- and even a month

4    ago I put together the biggest ever Nigerian business

5    conference for Nigerian exporters who were trying to do

6    trade with the city of Houston, the mayor of Houston, and

7    everybody who brought 164 businesses from Nigeria, and tried

8    to coach them on how to make relationships with American

9    businesses so we can facilitate trade, facilitate fund

10   transfers.  And that was something we did last year, and it

11   was the biggest thing that the Nigerian community had ever

12   done in the U.S. in the business community.  2,500 people in

13   attendance.  I was the organizer, everyone knows me, and

14   everyone comes to me.

15        So there's no way to overstate the fact that in the

16   community people just know that if you have any financial

17   issue, especially if there's a fraud problem, you call me.

18   So my phone, and my emails, and my WhatsApps are constant

19   with these questions.

20   Q    And have you seen in your experience cases where the

21   bad guys are taking advantage of someone to move money and

22   that person doesn't know the money is bad?

23   A    Yes.  That's overwhelmingly the case.

24   Q    Now one final question.  You said you reviewed

25   communications between Ken and Clinton; is that correct?

1    A     Correct.

2    Q     And based on your review of all the evidence, this is a

3    situation where Ken was asking Clinton to move money,

4    correct?

5    A     Yes.

6    Q     For a Nigerian living in the United States, a request

7    to move money would be perceived as just a part of this

8    informal economy, correct?

9    A     Yes.

10   Q     And so the mere fact that someone is asked to become

11   involved in a transaction, that doesn't tell us whether or

12   not that person was aware the money was bad, correct?

13   A     No.  They usually don't find out until the bank freezes

14   the account.  That's when I get the call.  And it always

15   starts as an asset forfeiture.  Bank of America just seized

16   my account --

17              THE COURT REPORTER:  Could you please speak a

18   little slower?  I'm having a hard time keeping up with you.

19              THE WITNESS:  It usually starts with the bank

20   flagging a bank account and shutting it down and making --

21   putting the owner on notice that they no longer have access

22   to their funds.  That's usually when I get the call, and

23   it's when we engage that that we find out that they were an

24   innocent mule.  They had a lot of monies to be paid into

25   their account, or they had an account to be used in some way

1   that the government has now determined to be illegal after

2   the fact.

3   Q    Now you used the term innocent mule.  Have you also

4   seen that term used by FBI and Homeland Security?

5   A    Yes.

6   Q    Thank you, sir.

7         MR. MEZIANI:  Does the Court have any questions of

8   Mr. Eze at this time?

9         THE COURT:  Not right now.

10        MR. MEZIANI:  Thank you.

11                    CROSS-EXAMINATION

12  BY MR. YOUNG:

13  Q    All right.  Mr. Eze?

14  A    Eze.

15  Q    Eze.  Thank you.

16        You spent about an hour and a half with the defendant;

17  is that right?

18  A    Yes.

19  Q    I guess maybe actually -- I'm sorry.  I wrote down an

20  hour and 15 minutes.

21  A    Yes.

22  Q    Okay.  And what tribe is he from?

23  A    He's Igbo.

24  Q    He's Igbo like you?

25  A    Uh-huh.  (Affirmative)

1    Q    What did you guys talk about?

2    A    I asked him what he was thinking.

3    Q    Okay.

4    A    I asked him who Ken was and what his relationship with

5    Princess was, where they met, how they knew each other, the

6    genesis of the transactions.  I asked him questions about

7    his background, who he was, his family, stuff like that.

8    Q    Okay.  He told you he was in college, I assume?

9    A    He told me he was in college, yes.

10   Q    Okay.  And you met him -- I'm sorry -- in Atlanta where

11   he's at?

12   A    Correct.

13   Q    Okay.  I'm assuming you didn't pay for that.  I'm

14   assuming Mr. Meziani paid for that; is that right?

15   A    The government paid for that.

16   Q    You didn't have to pay for it?

17   A    I didn't have to pay for it, no.

18   Q    Gotcha.

19        And are you currently under contract with Mr. Meziani?

20   A    No.

21   Q    I'm sorry.  So you're not being paid at all for your

22   expert opinions?

23   A    That's what I mean.  The federal government pays me for

24   this work.

25   Q    Through Mr. Meziani, is that right?

1    A    I don't know what you mean by that.

2    Q    Okay.  So the federal government actually didn't get

3    you as an expert.  Mr. Meziani did; isn't that right?

4    A    Correct.

5    Q    So that's kind of what I'm just getting at.

6         So you're being paid for your testimony?

7    A    Correct.  I'm being paid for my time on this case.

8    Q    And your time on this case.  Okay.

9         How much time have you spent on this case?

10   A    I don't remember.  I don't have my records.

11   Q    Okay.  So more than ten hours?

12   A    Yeah.

13   Q    More than 20 hours?

14   A    Yeah.

15   Q    Okay.  In terms of documents, there's approximately

16   65,000 documents that have been provided to Mr. Meziani.

17   Have you looked at anything other than the communications

18   that he's provided you?

19   A    I've looked through a significant portion of it, yes.

20   Q    Okay.  Like what?

21   A    There was a discovery filed that I received and I just

22   kind of went through all the documents that were in that.  I

23   can't tell you what it was.  It was a couple of months back.

24   Q    Okay.  So like bank records?

25   A    Bank records, definitely.

1   Q    Okay.  So bank records.

2   A    Letters from the government, letters to the government.

3   Yeah.

4   Q    Okay.  And then we provided a lot of communications,

5   text messages, whatnot, and your report seems to indicate

6   that you didn't get all of those.

7        Let me read to you from page six of your report.  Do

8   you have that?

9   A    Uh-huh.  (Affirmative)

10  Q    Okay.  So the first full sentence, what does that say,

11  on page six?

12  A    Critically, I have not been provided any communications

13  between Ken and Uchendu or between Princess and Uchendu in

14  which there is an express discussion or acknowledgment of

15  transferring illicit funds.

16  Q    Okay.  But you have looked at all of the communications

17  that you were provided?

18  A    Yes.  Yes.

19  Q    Got it.  Okay.

20       You also looked at photographs of a Mercedes that Ken

21  sent to Uchendu?

22  A    Yes.

23  Q    Okay.  Did the communications indicate what that

24  transaction was about, or was it just photographs?

25  A    I really don't remember.

```
 1   Q    Fair enough.

 2        Okay.  Let's talk a bit about your qualifications first

 3   and your resume that was provided in Exhibit A.

 4        So you're a 2006 law grad; is that right?

 5   A    Yes.

 6   Q    And you went to law school from '02 to '06?

 7   A    Yes.

 8   Q    So four years?

 9   A    Yes.

10   Q    So you were working at the time you were also in law

11   school?

12   A    For my first year, yes.

13   Q    Got it.  Okay.

14        Now the resume -- I was a little confused on this -- it

15   indicates that you were an associate from August 3rd of 2004

16   to March 15th of 2008.

17        Do you see the resume there?

18   A    Yes, I do.

19   Q    Okay.  And I'm just a little confused on that.  Had you

20   already passed the bar on August 3rd of 2004?

21   A    No.  No.

22   Q    Okay.  So were you like a summer associate or like a

23   law clerk, or something?

24   A    I was a summer associate for two summers.

25   Q    Got it.  Okay.
```

```
 1          So you weren't actually an associate that whole time.
 2   You were, you know, essentially kind of working as a law
 3   clerk until you passed the bar; is that right?
 4   A    Yes.  And I will say this.  This resume is -- I tried
 5   to fit it on one page, and that's probably the one I
 6   scrunched up, but it did use to say summer associate, then
 7   associate.
 8   Q    That's fine.
 9          I didn't notice on this resume the AideMoney stuff.
10   You just didn't include that on this, right?
11   A    Yeah.  It's not there.
12   Q    Also Mr. Meziani said you had a certification in
13   Fintech from the Wharton school.  But I didn't see that on
14   there either?
15   A    No.
16   Q    In terms of -- I'm sorry.
17              THE COURT:  So just to be clear, when did you
18   start as a full-time associate at Shearman & Sterling?
19              THE WITNESS:  2006.
20              THE COURT:  2006.  So you were there --
21              THE WITNESS:  Two years.
22              THE COURT:  -- for three years?
23              THE WITNESS:  I started in '08.  Two years.
24              THE COURT:  Okay.
25   //
```

```
 1   BY MR. YOUNG:
 2   Q    Okay.  In terms of your work currently at your own law
 3   firm, it indicates that you've represented several Nigerian
 4   entrepreneurs in DOJ investigations and asset forfeiture
 5   actions alleging money laundering, wire fraud, bank fraud,
 6   and romance scam.  Can you give me a ballpark of how many of
 7   those you've defended in DOJ actions?
 8   A    I lose count at like seven.
 9   Q    So you lose count --
10   A    I lose count at seven.
11   Q    At seven.  Okay.  Got it.
12        Were those all in the -- let's see.  Houston is the
13   Southern District of Texas?
14   A    Uh-huh.  (Affirmative)
15        No, no, no.  We had Western District of New York too.
16   Q    Okay.  Western District of New York and Southern
17   District of Texas.
18   A    New Mexico, Missouri.  Yeah.
19   Q    Were these all businessmen who were all accused of
20   essentially kind of the same thing that Mr. Uchendu is
21   accused of or were they different types of cases?
22   A    They're different.
23   Q    Different.  Okay.
24   A    Some were and some were not.
25   Q    Some were and some were not?
```

1    A    Uh-huh.  (Affirmative)

2    Q    Okay.  Let's talk about your experience as an

3    accountant for a second.  It sounded like you worked as an

4    accountant until essentially you finished -- not finished

5    law school.  It sounds like until -- it sounds like until

6    about '04; is that right?

7    A    Yes.

8    Q    Okay.  And Mr. Meziani asked you -- let me make sure I

9    get my notes right.

10       As an accountant, did you ever work for someone who

11   told you they were engaged in money laundering?

12   A    As an accountant?

13   Q    Yeah.

14   A    No.

15   Q    Did you ever work for someone you suspected money

16   laundering?

17   A    Worked for?

18   Q    Yeah.  I mean you're doing work for -- were you

19   representing clients at the time or were you representing a

20   company?

21   A    As an auditor for Ernst & Young, I was an auditor, so I

22   would audit financial statements of whatever company I got

23   sent out to.

24   Q    Okay.  So it's just companies.  You weren't actually

25   dealing with individuals.  Now I understand.  Thank you.

```
 1        Okay.  From your website it indicates that you're a
 2   retained expert for U.S. Federal District Court system
 3   providing expert guidance on Nigerian --
 4             THE COURT REPORTER:  Please slow down when you're
 5   reading.
 6   BY MR. YOUNG:
 7   Q    From your website it talks about how you're a retained
 8   expert in the federal court system.  Other than this case,
 9   what are the other cases that you've been retained for to
10   provide expert guidance to the federal district court?
11   A    None.
12   Q    None.
13   A    Just this one.
14   Q    Okay.  I mean this is from your website where you talk
15   about this.
16   A    What does it say?
17   Q    Here.
18             MR. YOUNG:  May I approach, Your Honor?
19             THE COURT:  Yes.
20             MR. YOUNG:  Thank you.
21   BY MR. YOUNG:
22   Q    I printed that up this morning from your website.
23   A    Okay.
24   Q    Okay.  And this is the first time you've actually been
25   retained as an expert; is that right?
```

```
 1   A     This is the first time I've been retained as an expert,
 2   but I've also been approached by the FBI to essentially help
 3   them with this problem.
 4   Q     Tell me about that.
 5   A     A couple of agents came to my office in 2018,
 6   thereabouts, came looking for me because there's a -- it was
 7   a money launderer who was very popular back then.  She was
 8   the minister of petroleum under a past administration and
 9   she had been accused of a lot of money laundering in the
10   United States.  So they wanted anyone who understood the
11   community and the transactions enough to give them some
12   insight as to how they would go about making a case against
13   this person.
14   Q     I see.  Were you paid for your time for that?
15   A     I was not paid for that.  We discussed payment, but it
16   never got paid.
17               THE COURT:  And this person, what country was she
18   in?
19               THE WITNESS:  Nigeria.
20               THE COURT:  Okay.  Well, you were talking about
21   being approached by Asians, and then I got very confused.
22               THE WITNESS:  Agents in the U.S.
23               THE COURT:  Oh, agents.  I thought you said
24   Asians.  I'm sorry.
25               THE WITNESS:  FBI agents.
```

```
 1              THE COURT:  Okay.
 2   BY MR. YOUNG:
 3   Q    When did you write this on your website?  Was it after
 4   you got retained by Mr. Meziani?
 5   A    Yes.
 6   Q    Let's talk about AideMoney.  It sounds like a very
 7   impressive thing that you've been putting together.
 8        You started this business in 2020, is that right,
 9   October of 2020?
10   A    Uh-huh.  (Affirmative)
11   Q    Okay.  Are there any other investors in this business?
12   A    Yes.  We have about eight investors at this point.
13   Q    Okay.  I went through the website.  It's very
14   impressive.  It seems like you're licensed in all the
15   states; is that right?
16   A    Not all the states.
17   Q    Not all the states.
18   A    Were up to 39 I think.
19   Q    You know, I should have taken the time to actually
20   count.  It was a long list.  Okay.
21        Is it also registered with FinCEN?
22   A    Yes.
23   Q    About how much money is coming through that per year?
24   A    Not a lot.
25   Q    Do you mind ballparking that for me?
```

1   A    It's a startup and we're struggling to stay afloat.

2   Last year we did maybe 200 -- $200,000 total.

3   Q    Okay.  Because you talked about earlier how when you

4   had started the company and like in the first two months it

5   sounded like there was a fraudulent transaction, like

6   55,000, or something like that?

7   A    Yeah.

8   Q    Okay.  So at least last year was about 200,000?

9   A    Yes.

10  Q    Okay.  What was the year before, do you remember?

11  A    No.  Last year I think was our first full year of --

12  yeah, because we built the product starting in 2020.

13  Q    Sure.  So then you have 2021 and 2022?

14  A    Yeah.  So 2021 we launched the product and got hit by a

15  fraud.  It was so bad that we had to basically shut down

16  again and retool the technology.  2022 became the real first

17  year of operation.

18  Q    That makes sense.

19       Are you on track to surpass that this year?

20  A    Yes.  We're on track to surpass that.

21  Q    I mean just ballpark?

22  A    One of the things that happened this year was when we

23  set up the business in October of 2020, two months later the

24  Nigerian CBN changed its policy, and that policy changed --

25  it took our business plan and completely scuttled it.  It

1    didn't work anymore.  The technology wouldn't work because

2    in money transfer, money leaves as U.S. dollar and arrives

3    as naira.  That's how it works everywhere in the world.  The

4    Nigerians got it into their head that they wanted dollars to

5    leave as dollars and arrive as dollars.  Our system wasn't

6    built for that.  So we had to retool.

7         Well, again, this year, July, new administration comes

8    in and they go right back to naira leaves U.S. -- no, sorry.

9    Dollar leaves U.S., naira hits Nigeria.  So we had to again

10   retool.  So that took us offline for quite a while.  We're

11   just now -- our Christmas promotion is where we're trying to

12   re-kick-start it.  It's been very difficult.  It's a very

13   challenging business.

14   Q    I see.  I mean it sounds like there's a need for it, so

15   I'm impressed that you've put this together.

16        My assumption is that your company takes like a little

17   bit of a cut of the money that's transferring; is that

18   right?  That's how it works?

19   A    The current model is to make money on the FX spread,

20   the foreign currency spread.  We try to buy naira for

21   cheaper than we sell it, and that's where we make the money.

22   But to the customer, the transaction is free.

23   Q    I see.  Okay.

24        Do you have a legal responsibility to report suspicious

25   transactions through AideMoney?

```
 1    A    Absolutely.
 2    Q    Okay.  It also sounds like you have a team of
 3    individuals in Lagos who are kind of on the ground.  How
 4    many of those people are there?
 5    A    Well, two.
 6    Q    Two?
 7    A    Two, yeah.
 8    Q    I see.
 9         And those two were the people who were kind of doing
10    surveillance and trying to get into, say, the Yahoo Boys
11    type groups and so forth?
12    A    Correct.
13    Q    How big is Lagos?
14    A    Forty million people.
15    Q    Forty million in Lagos?
16    A    Yeah.  Yeah.
17    Q    Okay.  Let's talk about -- I mean you've indicated that
18    part of your expertise comes from representing people who
19    have been accused of crimes; is that right?
20    A    Yes.
21    Q    And part of your expertise comes from your status in
22    the community?
23    A    Yes.
24    Q    There's lots of people who are calling you --
25    A    Yes.
```

1   Q    -- and talking to you and saying, hey, I got ripped

2   off, or this thing happened?

3   A    Yes.

4   Q    Okay.  And I assume over the years you've talked to a

5   number of people.  Have any of them told you that, yeah, I

6   was engaged in money laundering?

7   A    Yes.

8   Q    Okay.  Out of -- you know, who are those people?

9   A    Well, not I was, but I am contemplating a transaction

10  that I know is money laundering.  I've had those calls.

11  Q    So you've had conversations with people where they have

12  said I'm thinking about doing this transaction and I think

13  maybe it is money laundering.  Is that what -- like that's

14  the kind of people you have talked to?

15  A    Yes, and not directly.  The one I remember that comes

16  to mind is someone who knew me, but also knew my position

17  and where I stood on the issues, called somebody else who

18  was close to me to ask them what Uzoma would say if they

19  brought that idea to me.  And the person told them what they

20  expected to hear, which is stay away.  He'll expose you.

21  Q    I mean you're out there providing information for the

22  community; is that right?

23  A    Yes.

24  Q    I mean that's helpful?

25  A    Yes.

1    Q    Absolutely.

2         Now Mr. Meziani kept using the term bad guys.  And I

3    think we can all kind of talk about bad guys being, say,

4    Yahoo Boys, or, you know, the criminals who you believe are

5    exploiting the system?

6    A    Yes.

7    Q    Okay.  How many of those people have you talked to?

8    A    The bad guys?

9    Q    Yeah, the bad guys.

10   A    I don't talk to them.  I don't have a relationship with

11   them.

12   Q    Okay.  So you haven't, say, interviewed any of these

13   scammers, talked to any of these scammers, kind of

14   understood the schemes from the scammers, anything like

15   that?

16   A    My team has.  That's what my team in Lagos seeks to do

17   surreptitiously.

18   Q    The team of two people?

19   A    The team of two people.

20   Q    Okay.  And then they provide you reports?

21   A    They give me data on what they find.

22   Q    Okay.  And based on those reports you formed your

23   opinion?

24             MR. MEZIANI:  Objection, misstates.

25             MR. YOUNG:  No.  He just said -- wait, I'm sorry.

1    I'm a little confused about the misstates.

2    BY MR. YOUNG:

3    Q    They provide you reports; is that right?

4    A    Yes.

5    Q    And then based on those reports you were able to form

6    these opinions that Mr. Meziani has provided to the Court;

7    is that right?

8    A    No.  That's intelligence gathering.  That's what we

9    call it.

10   Q    So those reports had nothing to do with the opinions

11   that you formed?

12   A    Yes, they do, but they're a piece.  As with everything

13   that you do, there are pieces that you grab from different

14   aspects of your life and different aspects of the

15   experience.  It's not just one thing.

16        So that informs my understanding of what a scammer

17   looks like.  You know, what their profile tends to be.  Do

18   they own a passport?  You know, little things like that.

19   That's what we glean from them.

20        So yes, it helps my knowledge base, but it's not the

21   basis of the opinion.  It's just one piece.

22   Q    It's one piece of the opinion.  Okay.

23        Did you provide those reports to Mr. Meziani?

24   A    No.

25   Q    Okay.

```
 1              THE COURT:  Are these written reports or oral
 2    reports, for the most part?
 3              THE WITNESS:  For the most part, they're oral.
 4    We're trying to -- we're really starting off of this thing.
 5    This is a new initiative.  We're looking for money to get
 6    people to go out there and do it full-time.  But for right
 7    now, it's really just something we're building.  It's very
 8    initial, very startup.
 9    BY MR. YOUNG:
10    Q    Okay.  Talking about your legal practice, it says in
11    your home section on your website -- again, talking about
12    money laundering, wire bank fraud defense.  In your legal
13    practice, have you ever represented someone who lost their
14    own money as a victim of a scam?
15    A    Yes.
16    Q    How many of those people have you represented?  Just a
17    ballpark figure.
18    A    Three come to mind.
19    Q    Three?
20    A    Three, yeah.
21    Q    Okay.  I mean it seems to be the first -- well, never
22    mind.
23         Okay.  So three -- you've represented three people,
24    that you remember, who have lost their own money as the
25    victim of a scam.  Did you bring legal actions for those
```

1    clients?

2    A    No, I did not.

3    Q    So what did you do for them?

4    A    I wasn't ready for this testimony.

5         I can't remember right now, but I do know that I've had

6    a series of those happen.

7    Q    Okay.  Do you try to help them recover their money?

8    A    A lot of times -- okay.  I remember one.  The issue was

9    I've lost money but the U.S. government is going to think I

10   was involved.  So how do we approach the banks and create

11   documentation and exculpatory evidence that shows that, hey,

12   I didn't know I'm a victim.  So that's one that I remember,

13   for instance.  So it varies.

14   Q    Talking about your money laundering and wire bank fraud

15   defense, you talked about that you remember seven people

16   that you've represented in those types of cases?

17   A    Yes.

18   Q    What was the result for those seven?  Were they

19   indicted?

20   A    Some were already indicted when we started.  The last

21   one we did was indicted when we started.  It was actually

22   under remand, home confinement for almost two years, and we

23   just got them a different prosecution agreement based on the

24   fact that they were innocent mules and the government was

25   pretty convinced that they were a queen pin.  In fact, when

1    I was brought in, at the end of it we were able to show that

2    she was just a money mule, an innocent one at that, and the

3    government, as far as I know, let her go.

4    Q    Okay.  So that was one of them.  What about the other

5    six?

6    A    The others have pretty much toed that line.  I usually

7    have been able to -- because what I find is that there's a

8    lot of confusion.  This practice of Nigerians moving money

9    is very unique to the Nigerian community, well known,

10   ubiquitous in the community.  Outside of the community,

11   doesn't happen.

12        So when I talk to the DOJ and I talk to the agents,

13   what tends to happen is they see that, okay, it looked dirty

14   just because I've never brushed up against this.  But when

15   I'm able to give it context, usually the answer is, okay, we

16   see how this person was not involved.  So I'm able to bring

17   knowledge, and that's what I bring to it.

18   Q    I see.

19        Okay.  So let's talk about some of your opinions in

20   this document.  Did you prepare this document or did

21   Mr. Meziani prepare this document, because your signature is

22   on there too?

23   A    Yes.  We co-prepared it.

24   Q    Okay.  You co-prepared it.  Which parts did you write?

25   A    Some of this, like the qualifications, I see some of my

1    language in there.  The statement of opinion, I see some of

2    my language in there.

3    Q    Okay.

4    A    Yeah.

5    Q    So like most of it is your language pretty much?

6    A    Yes, yes.

7         Well, I agree with all of it.  Let's put it that way.

8    Q    I understand.  Okay.

9         The informal money transmitting network that we've been

10   talking about for the last little while, would you call it a

11   hawala?

12             THE COURT:  A what?

13             THE COURT REPORTER:  A what?

14             MR. YOUNG:  Hawala.

15             THE COURT:  Can you spell that and tell me what it

16   means?

17             MR. YOUNG:  H-a-w-a-l-a.

18   BY MR. YOUNG:

19   Q    What is a hawala?

20   A    I wouldn't call it a hawala fully, because a hawala

21   is -- at least the U.S. government is taking a stance that

22   it can be an unlicensed money transmitting -- money transfer

23   business.  So that's why I'm not going to call this a

24   hawala, because a hawala is people who have immigrated to

25   the U.S. finding informal channels of moving money back and

1    forth.

2          In fact, in the hawala culture -- and I think the

3    hawala is a Pakistani word, or Bengali -- but the idea there

4    is we set up an informal money transfer business.  So you

5    have one person who you come to, and if you need money or if

6    you need money moved, they'll move it for you and you pay

7    them a fee.

8          So hawala really took on more of a business aspect.  It

9    wasn't people doing favors for family and friends and people

10   with whom they were within one degree of separation, or

11   whatever.  It was more a network.  So the government didn't

12   like it.

13         So this isn't quite hawala.  This is really just me and

14   my friend, me and my cousin, somebody I know, have a

15   relationship.  They have a need.  I have a need.

16   Q     These are personal hawalas, or informal hawalas?

17   A     I wouldn't call them hawalas.

18   Q     But we're transmitting money not through regular

19   channels; is that right?

20   A     Again, transmitting is the word that I have a problem

21   with, as I described it to you.  He paid a bill for me in

22   Nigeria that I needed paid, and I paid a bill for him that

23   he needed paid in America.  That's not a transmission of

24   money.

25   Q     That's the very definition of what a hawala is, though.

1    We can quibble about that later.

2         So your first opinion is there's a demand for ability

3    to exchange naira for dollars outside the Central Bank of

4    Nigeria; is that right?

5    A    Yes.

6    Q    And that demand exists because of the restrictive

7    policies of the Central Bank of Nigeria?

8    A    Yes.

9    Q    And it sounds like the Central Bank of Nigeria kind of

10   switches regulations often; is that right?

11   A    Yes.

12   Q    In fact, it just happened to you guys with AideMoney?

13   A    Twice.

14   Q    Twice.  Okay.

15   A    In two years.

16   Q    Now you indicate that the Nigerians in the U.S. send

17   $24 billion to Nigeria annually through what you termed like

18   official channels; is that right?

19   A    Correct.

20   Q    And then the research that you paid 5,000 pounds for

21   indicated that there was at least a $24 billion kind of

22   informal network?

23   A    Correct.

24   Q    What's the basis for that research?

25        I'm sorry.  That's a stupid question.

```
 1        In terms of paying this intelligence agency, or
 2   whatever it was, how do they do their research to give you
 3   the number that you got?
 4   A    I'm not a researcher so I don't know.  But they are the
 5   source.  If you want to know anything in that business, I'll
 6   pull up -- if I had some time, I'd go through my phone and
 7   pull up their name.  They are recognized as the authority on
 8   these things.  The banks go to them.  Everyone uses them.
 9   Q    Okay.  Okay.  I had never heard of them, and it sounded
10   like you weren't --
11   A    I didn't give you the name.
12        THE COURT:  What is the name?
13        THE WITNESS:  I can't remember it.  I'd have to go
14   through my phone.
15        THE COURT:  And they actually sent you a report of
16   some kind?
17        THE WITNESS:  Yes.  Yes.  And I have the report.
18   BY MR. YOUNG:
19   Q    And you said it was either Panjiva -- or Pangea -- or
20   Intelligence Insider?  Those were the two names that I heard
21   you kind of say.
22   A    I don't think it's one of those two.  I can find it.
23   Q    Okay.  And in that report did they provide you kind of
24   citations to the information that they had gathered to give
25   you?
```

```
 1   A      Yes.

 2   Q      Okay.  So it had footnotes and stuff?

 3   A      Yes.

 4   Q      Okay.  Was that provided to Mr. Meziani?

 5   A      He never asked for it.

 6   Q      Okay.

 7          THE COURT:  I take it you could provide it if we

 8   wanted to see it?

 9          THE WITNESS:  Yes.

10          THE COURT:  Okay.

11   BY MR. YOUNG:

12   Q    As you sit here talking about the official 24 billion

13   and then the informal 24 billion, do you know what

14   percentage of that is criminal proceeds?

15   A    Percentage of which one?

16   Q    Both.  You can break it down for me.

17   A    The U.S. government and the FBI keep pretty detailed

18   records of what fraud loss on remittance is every year.  But

19   it's very hard data to get into because you have to look at

20   what corridor, where the sent corridor is, where the

21   receiving corridor is.  So it's the kind of data where,

22   depending on how you slice or dice it, a different number

23   comes out.  So I don't know the number offhand, but I know

24   where to find it.

25   Q    Okay.  I mean talking about the official network, you
```

1    know, you had some number, but you don't have it on you

2    right now?

3    A    Yes.

4    Q    And then for the informal network, again, same kind of

5    thing?

6    A    Exactly, yeah.

7    Q    Okay.  In terms of -- let's see.  On page two of your

8    opinion you state, starting in kind of the middle of the

9    opinion number one, dollar transactions are severely limited

10   with the express intention of not allowing any dollars to

11   leak out of Nigeria and the government brazenly maintained

12   over four different exchange rates that enabled cronies to

13   get dollars allocated to them at one of the low official

14   rates, for example, naira at 440 to the dollar, and then

15   sell it to the black market at naira 700 to the dollar.  Is

16   that right?

17   A    Yes.

18   Q    Okay.  And then your citation is to the CBN -- the

19   official CBN government site --

20   A    Yes.

21   Q    -- for that statement.

22        So I looked at that -- I looked at that --

23            MR. YOUNG:  May I approach, Your Honor?

24            THE COURT:  Yes.

25   //

1    BY MR. YOUNG:

2    Q    So this is the citation for that.  Can you show me

3    where on there it talks about enabling cronies to get

4    dollars allocated to them at one of the low official rates?

5         Honestly that seems to be kind of a CBN valuation of

6    naira to the dollar.  That's all it seems to be.

7    A    Yes.  Maybe I cited it wrong, or maybe that's not the

8    information.  But this information is readily available.

9    It's something I can get for you to update the disclosure.

10   Q    Okay.  Now you keep using the term in here essentially

11   kind of ordinary law-abiding Nigerians.  What does that

12   mean?

13   A    Me.

14   Q    Not just you, right?  A bunch of the people you work

15   with, right?  And your clients, I assume?

16   A    Maybe I'm not sure I understand the question.

17   Q    I'm trying to understand what ordinary law-abiding

18   Nigerians means when this informal network is also being

19   used.  And I guess my question is, in Nigeria, are there

20   laws that preclude people from essentially kind of engaging

21   in this activity or are there no laws in Nigeria that

22   preclude people from engaging in these informal networks?

23   A    No laws.

24   Q    There's no laws?

25   A    No laws.

1   Q    So there's no laws that -- I mean you talk about a

2   black market and that kind of stuff.  But the black market

3   is not a thing in Nigeria?

4   A    It is a thing.  It's called the black market, but it's

5   also one of those terms that are just unnecessary.  The real

6   word should be parallel market.

7   Q    Okay.  A parallel market where I can buy goods and

8   services at a different price; is that right?

9   A    Yes.

10  Q    I'm still trying to figure out the difference between

11  black market and that.

12  A    Black market and what?

13  Q    Black market and what you just described.

14  A    I don't like to use black market because it comes with

15  that derogatory, kind of negative implication.  It's a

16  parallel market.  That's the only thing I'm saying.  It's

17  the same thing.

18          THE COURT:  And to your knowledge there are no

19  Nigerians law that prohibit the parallel market?

20          THE WITNESS:  No.

21          THE COURT:  I guess that was a bad question.

22          Are there any Nigerian laws that prohibit the

23  parallel market?

24          THE WITNESS:  To my knowledge, Your Honor, no.

25  //

```
 1              MR. YOUNG:  Judge, you can cross.  It's okay.
 2              THE COURT:  No.  That was a bad question, but I
 3    was confused.  And I'm not trying to cross.  I'm trying to
 4    answer my own questions.
 5              MR. YOUNG:  That's fair.
 6    BY MR. YOUNG:
 7    Q    In this opinion you indicate, at the end of opinion
 8    number one, in this case the transfers involving Clinton
 9    Uchendu are consistent with legitimate transactions in this
10    parallel market.
11    A    Which page are we looking at?
12    Q    It's the end of -- it's the beginning of page four.
13    A    Yes.
14    Q    Okay.  How did you form this opinion?
15    A    So another form of this parallel market that we see a
16    lot is Nigerians are very entrepreneurial, even when they're
17    in the U.S.  And because Nigeria is an oil and gas country,
18    if you come to Texas, for instance, a lot of engineers and
19    people in that business have a company in Nigeria that does
20    oil services, exploration, whatever it is.  They'll call
21    themselves oil and gas.
22         In Texas, they'll have a sister entity that's an oil
23    servicer.  And what that Texas company does is it procures
24    materials for the Nigerian entity to do its drilling and
25    exploration.
```

```
 1            So you have those two companies and significant amounts
 2    of value moved between them.  So we've seen situations where
 3    people come to people and say, hey, you know what?  I've got
 4    dollars being paid for work that my team is doing in Houston
 5    in dollars, but I need to move it to Nigeria because, you
 6    know, we have more dollars here and we need more money over
 7    there.  We have restrictions on how much we can send.  We
 8    need to get $4,000 to payroll tonight.  Can you help me pay
 9    this person's payroll and take the dollars essentially.  So
10    we've seen that too.  It's the next most popular one, I
11    think, next to auto.
12    Q    So oil and gas.  Okay.
13            So essentially every time money is going to transfer,
14    it's about goods or services; is that right?
15            I mean you talked about college education, vacations,
16    cars, and then you just talked about payroll --
17    A    -- assistance.  Does that qualify as goods and
18    services?
19    Q    I think -- yeah.  It's probably services.
20    A    Okay.  Okay.
21    Q    So yeah.  It's generally about goods and services; is
22    that right?
23    A    I've got to think about that one.
24            Money for education, paying your hospital bills.  I
25    think I'm -- I'm not comfortable with the goods and services
```

1   because I think there are other things that don't meet that.

2   Q    That's fair.

3        Okay.  Moving to your second opinion.  In your second

4   opinion you state, it's the second sentence, often the

5   people involved in fraud also misrepresent the nature of the

6   transactions so that the third parties -- so that third

7   parties are not aware they are transferring funds obtained

8   from proper means.

9   A    Improper means.

10  Q    Improper means.  I apologize.  Thank you.

11       How do you form the basis of that opinion?

12  A    Same as before.  I mean between my practice, my

13  standing in the community, and AideMoney, this is pretty

14  much my life.

15  Q    Okay.  So the seven people that you represented.  The

16  three other people that you represented who were essentially

17  victims of fraud, right?  I'm assuming various phone calls.

18  A    Numerous advice.

19  Q    But no interviews with the actual criminals, right?

20       It's not a trick question.  I'm just asking.

21  A    I'm trying to remember.

22  Q    Okay.

23  A    I've never had cause to interview the actual criminals.

24  And the criminals are usually not here for you to find.

25  They disappear.  That's the whole point of the scam.  Poof,

1    every single time.

2    Q    Okay.  In this opinion you describe a hypothetical in

3    which an auto dealer unknowingly receives money from a

4    romance scam victim, that's then applied to the purchase of

5    a car from the auto dealer, right?  I mean you talk about

6    this -- is that where you use the -- Lisa.  You talked about

7    Lisa, you know, and whatnot.

8         Were you provided any evidence that Mr. Uchendu was

9    selling automobiles or any other goods in this case?

10   A    Not that I remember.

11   Q    Okay.  In terms of the factual basis for this

12   hypothetical, is this actually something that happened to

13   somebody you know?

14   A    Yep.

15   Q    Okay.  We talked about the Yahoo Boys.

16   A    That's actually the case I just told you that we got a

17   deferred prosecution from the federal government on.

18   Q    Sure.  That was one of the seven that you talked about?

19   A    Yes.

20   Q    Got it.  Okay.

21        Your third opinion, on page five, in that first

22   sentence you state unlike those involved in fraud, unknowing

23   person -- let's see -- unknowing persons, like the auto

24   dealer, involved in money mule transactions use their own

25   names and accounts.  Is that right?

1    A    Yes.

2    Q    I'm just reading from your report.

3    A    Yes.

4    Q    So is it your opinion that only people involved in

5    fraud use false names on their account?

6    A    I don't understand the question.

7    Q    Okay.  So you talked about here -- you have an opinion,

8    you say, unknowing persons involved in money mule

9    transactions use their own names and accounts.

10   A    Yes.

11   Q    Okay.  So if somebody doesn't use their own name and

12   account, then are they involved in fraud or not?

13   A    It's case by case.  It's not --

14   Q    Case by case.

15   A    Yeah.  Yeah.

16   Q    Okay.  Is it fair to say that there are people who use

17   their own names on accounts and are still engaged in fraud?

18   A    No.  We've got to take that question back.

19   Q    Okay.  Go ahead.

20   A    It's not -- yes, anything is fair to say.

21        I guess what I'm struggling with is there are -- I'm

22   sure there are exceptions to that rule.  It can't be a

23   hundred percent that every single person who uses their

24   account is not a scammer.  But overwhelmingly, the evidence,

25   anecdotally and through my personal experience, is always

1    that the bad guys understand.  You don't have to watch Law

2    and Order to know that the government and investigators

3    follow the money.  So they know never to let the money be

4    traced back to them.

5         So it's really rare that a money launderer would use

6    their -- it defeats the purpose of money laundering.

7    Q    You have not ever interviewed somebody who's actually

8    engaged in money laundering; is that right?  To your

9    knowledge.

10   A    To my knowledge -- well, my team has.  I just told you

11   that.

12   Q    So what do they say?

13   A    That they use shell entities and make sure the money is

14   never tracked back to them.  They don't keep bank accounts

15   in the same bank where they're laundering money.  That's one

16   thing we found out.  They wouldn't even have a bank account

17   in the same bank where the laundered proceeds are going to.

18   They'd go to another bank.

19   Q    But your second -- your second sentence in here says it

20   would be error to assume that every person involved in the

21   chain of sending funds to Nigeria is part of the original

22   fraud, right?

23   A    Yes.

24   Q    Is it error to also assume that people who are engaging

25   in fraud and illegal conduct will still use their own names

1   on their bank accounts?

2   A    Well, how do you not use your name on your bank

3   account?

4   Q    Like a real name, not a fraudulent name.

5   A    You can't use a fraudulent name on a bank account.

6   It's not going to fly.

7   Q    So then -- I guess, then -- you were talking about the

8   bad guys before and you were talking about how the bad guys

9   don't want their names on stuff.

10  A    Right.

11  Q    And so your argument -- your opinion would be that

12  essentially they never put their names on anything in order

13  to evade law enforcement scrutiny; is that right?

14  A    Never say never, but yes.

15  Q    Isn't it also fair to say, however, that sometimes

16  people who engage in fraud will use their own accounts?

17  A    On what basis would I be answering that question?

18  Q    You're the expert here.  You're the expert.

19  A    That's like proving a negative.  I'm not sure I get it.

20  I'm not trying to be combative.  I'm trying to understand

21  the question.

22  Q    I'm not either.  I'm not either.

23       Your statement seems --

24  A    Anything can happen.  Anything is possible.  But is it

25  probable?  No.

1    Q    Okay.  Fair enough.  So it's not probable.

2         That negates my next question, which is basically isn't

3    it true that people involved in fraud might use their own

4    names, you would say no?  You'd say no?

5    A    I would say no.

6    Q    Okay.  And then there was some more -- my other

7    questions were have any of your clients used their own names

8    and then pleaded guilty.  It sounds like for you, you've had

9    seven people who have not ever pleaded guilty; is that

10   right?

11   A    Yes.

12   Q    You indicate it's common for scammers to manipulate

13   innocent persons in the Nigerian community to act as money

14   mules.  And your basis for that, again, is everything we've

15   already talked about?

16   A    Correct.

17   Q    But you actually haven't done any research with the

18   scammers themselves, right?

19   A    I have.  I just told you about what we do in Lagos.

20   Q    So the two people on the ground --

21   A    And that's what I do for a living.  I research fraud

22   and scams.  I write about it.  If you just pull my name on

23   YouTube, you're going to see at least ten videos of me

24   talking about research I've done explaining what --

25   Q    I have watched all the videos.

```
 1          Okay.  In your fourth opinion you similarly indicate

 2    typically those directly involved in fraud do not open

 3    accounts in their own names because it is easy for law

 4    enforcement to trace; is that right?

 5    A    Yes.

 6    Q    Okay.  Thus, it's your opinion that knowing

 7    participants in money laundering do not use accounts in

 8    their own names?

 9    A    Yes.

10    Q    Okay.  So if Princess Eziyi -- I'm saying her name

11    wrong -- who's pleaded guilty, and Ken Adegbolo [sic]-- and,

12    again, I'm saying his name wrong -- were also engaged in

13    this scheme and used accounts in their own names, then they

14    were unknowing participants?  Is that what you're saying?

15    Because they pleaded guilty.

16    A    Run that by me again.

17    Q    Basically there's other co-defendants -- other

18    defendants and co-defendants in this case and similar cases

19    who used their own names on bank accounts and engaged in

20    money laundering.  How do you square that with your opinion?

21    A    I don't know anything -- I guess I don't know as much

22    about those details, but it would stick out to me as

23    strange.  But this isn't the only criteria for determining

24    that somebody wouldn't do this.  It's a whole picture of the

25    individual.
```

1    Opening an account and running transactions in your

2  name and walking -- one of the things that Clinton told me

3  was that he walked into the banking center to complain and

4  to argue with the bankers when the money was frozen, and to

5  make a big case about it.

6    These people also do not -- fraudsters and scammers and

7  money launderers don't like to even drive into the parking

8  lots of banks, that's one thing we realized, because they

9  know that banks always have sophisticated capture technology

10  that will see them.

11    So in addition to him using his account, going to the

12  bank and arguing about the money, these guys tend to be

13  flight risks.  At the first opportunity they want to get

14  out.  They want to get away as far as possible.

15    I understand Clinton was in Nigeria when he found out

16  he was being arrested, wrote to the agents and said I'm

17  coming back.

18    Another thing we profile is if they can get out of

19  America and get away with their ill-begotten gains, they are

20  not showing up here again.

21    So a lot of these things -- you can't just look at that

22  one thing.  That one thing is very good evidence.  And I

23  would ask you why didn't they use their accounts to launder

24  the ones they presumably asked Clinton to launder if they

25  were using their accounts?

1    Q    So let's talk a little bit about the communications

2    that you reviewed.

3         Now did you see any communications where Ken described

4    Mr. Uchendu as my boy instead of ur boy?

5    A    I don't remember.

6    Q    But you also reviewed communications between Princess

7    and Ken too, right?

8    A    Correct.

9    Q    Okay.  At the end of page six, the second paragraph,

10   kind of last two -- last several lines in here.  In this

11   case Uchendu did not use a false identity in opening the

12   accounts that are in issue in this case.  Uchendu used

13   accounts in his own name.  This is consistent with the

14   actions of an unwitting money mule.  The facts and

15   circumstances are consistent with Ken using Uchendu to

16   transfer money and are consistent with Uchendu acting as an

17   unwitting money mule.

18        That's one of your opinions, right?

19   A    Yes.

20   Q    Now you keep using the word consistent, but you're also

21   talking about Ken's work, because Ken -- didn't Ken have

22   accounts in his own name too?

23   A    I don't remember that.

24   Q    You don't remember.

25   A    You told me that.

```
 1   Q     Okay.  You don't remember looking at that?
 2         Again, you don't have any special insight other than
 3   the seven clients that you've worked with, hearing from, you
 4   know, a number of people in the community, and then your
 5   hour and 15 minutes of being with Mr. Uchendu; is that
 6   right?
 7   A     You like that seven number.
 8   Q     I do like that seven number.
 9   A     Yes.  But remember that in my community I'm recognized
10   as the expert and people bring these questions to me on a
11   regular basis.  As early as yesterday, I have one on my
12   phone.  It's constant for me.  So just because I didn't take
13   it all the way to the DOJ doesn't mean that I wasn't
14   consulted on it, and I didn't give advice on it, or somehow
15   try to ameliorate or mitigate, or help identify who the bad
16   people are.
17   Q     Sure.  Are you familiar with the term dating work in
18   the context of money laundering?
19   A     Say that again.
20   Q     Dating work.  Are you familiar with that term?
21   A     Dating work?
22   Q     Yeah.
23   A     Is that romance scam?
24   Q     Yeah.  So you're familiar with that term?
25   A     Yeah.
```

1    Q    How about wire wire?

2    A    Wire wire.  Okay.

3    Q    What is that?

4    A    I couldn't tell you.  They have -- these slangs change

5    all the time.

6    Q    Okay.  What about Ali?  What is that?

7    A    Ali is another form of scams, I think with Ali.  I

8    don't keep these on the top of my head.  I have them on my

9    computer somewhere.  I can always look them up.

10   Q    Were you provided with copies of any communications

11   referring to dating work, wire wire, or Ali before you

12   formed your opinions in this case?

13   A    Yes, I was.

14   Q    Okay.  And based on what you knew, you still formed

15   this opinion about Mr. Uchendu from those communications?

16   A    Yes.  Yes.

17             MR. YOUNG:  May I have a moment, Your Honor?

18             THE COURT:  You may.

19   BY MR. YOUNG:

20   Q    Talking just about AideMoney -- and, again, it's an

21   impressive thing you've put together -- $200,000 in 2022,

22   about how many transactions was that?  Like --

23   A    I couldn't tell you.

24   Q    Okay.  Are most of the transactions usually at the max,

25   which is 2,999?

1    A    No.  There's small figures, 200, 500.

2    Q    Okay.  And you don't have kind of a ballpark figure of

3    how much for 2023; is that right?

4    A    No.  I wasn't prepared for that, no.

5    Q    That's fine.

6         You talked about your team in Lagos of two people.  How

7    long have they been doing this for you?

8    A    We set this up in March of this year, February or

9    March.  I was in Nigeria December -- sorry.  It was set up

10   December of last year.  December 15 I was in Nigeria.

11   Q    Oh, I'm sorry.  So that's like March of 2023?

12   A    December of 2022.

13   Q    December of 2022?

14   A    Correct.

15   Q    Okay.  So about a year?

16   A    Yes.

17   Q    And just generally, what are their qualifications?

18   A    They are young bachelor degree holders who are in the

19   community and know these people, and know our business, and

20   deal with our customers, and see these complaints, and see

21   these foiled attempts, and are able to blend.

22   Q    And they're trying to infiltrate these groups to get

23   more information; is that right?

24   A    Yes.  That has been a challenge because these groups

25   are -- they are cartel.  They are dangerous.  You could end

```
 1    up dead.  So that was one of the things we had to be careful
 2    about is putting people in harm's way.
 3    Q    So were any of these people trained in undercover
 4    techniques?
 5    A    No.
 6    Q    Interrogation?
 7    A    There is no interrogation.
 8    Q    Like interviewing techniques?
 9    A    Yes.  I trained them.
10    Q    You trained them?
11    A    Yes.  I give them the training.
12    Q    What's your training in interviewing techniques?
13    A    I've done a bunch of depositions.
14    Q    How many?
15    A    In my career?
16    Q    Yeah.  Sure.
17    A    I don't know.  It's been a lot.
18    Q    Ten, 15?
19    A    Ten at least, 20.
20         MR. YOUNG:  I don't have any further questions,
21    Your Honor.
22         THE COURT:  Okay.
23         Mr. Meziani.
24         I guess I should ask you how much you have.  If
25    it's a short amount, we'll press on.  If it's long, we'll
```

```
 1    give Ms. Walker a break.
 2              MR. MEZIANI:  I think it's a short amount.  We can
 3    just finish up if that's okay.
 4                       REDIRECT EXAMINATION
 5    BY MR. MEZIANI:
 6    Q    Mr. Eze, you were asked some questions about this
 7    research or data you paid for.  Do you recall those
 8    questions?
 9    A    Yes.
10    Q    Is your opinion that there's a parallel market
11    dependent on that data?
12    A    Not wholly.  The data confirmed what I already knew.
13    Q    Would you still testify, based on your experience, that
14    there's a parallel market between Nigeria and the United
15    States in the absence of that data?
16    A    Absolutely.
17    Q    Mr. Young asked you some questions about goods and
18    services.  Do you recall that line of questioning?
19    A    Yes.
20    Q    And there were some questions about transactions
21    typically involved goods and services.  Do you remember that
22    topic?
23    A    Yes.
24    Q    If Mr. Uchendu was to testify at trial that he believed
25    these transactions were for goods and services, then in that
```

1   case that would be consistent with a legitimate transaction

2   in the parallel market, correct?

3   A    Correct.

4            MR. MEZIANI:  That's all I have.  Thank you.

5            THE COURT:  All right.

6            MR. YOUNG:  Just one question, Your Honor.

7                     RECROSS-EXAMINATION

8   BY MR. YOUNG:

9   Q    In reviewing all of the information that you've

10  received from this case, do you know how many people have

11  admitted to engaging in money laundering that are associated

12  with this case?

13  A    No.

14  Q    Okay.

15           MR. YOUNG:  No further questions.

16           THE COURT:  All right.

17           Anything further, Mr. Meziani?

18           MR. MEZIANI:  No follow-up.

19           THE COURT:  Thank you very much, sir.  You may

20  step down.

21           THE WITNESS:  Thank you, Your Honor.

22           THE COURT:  And, counsel, I guess I should start

23  with the U.S. Attorney's Office.  How much time do you need

24  to file your supplemental briefing?

25           MR. YOUNG:  Oh, to file?

1          THE COURT:  Yeah.

2          MR. YOUNG:  I'm sorry.  I had thought we were

3  doing argument today.  But you'd like us to file a brief,

4  that's totally fine.

5          THE COURT:  I suppose that it would be helpful to

6  me -- I mean, I'm happy to entertain argument, and we can

7  take a break and come back and entertain argument.

8          MR. YOUNG:  This is totally fine, Your Honor.  The

9  question is whether Mr. Meziani would also like the

10  transcript of this.  And, you know, I kind of have what I

11  can put down, but it's up to the Court.

12          THE COURT:  Well, I suppose to the extent that you

13  both have good enough notes that you're comfortable, that's

14  fine.  Otherwise we can ask Ms. Walker how long it would

15  take to have this transcribed.

16          MR. YOUNG:  I'm fine with my notes, but I defer to

17  Mr. Meziani.

18          MR. MEZIANI:  I'm fine to argue it today.  But I

19  mean it's the government's motion, if they want a

20  transcript.

21          MR. YOUNG:  I'm okay without a transcript.  That's

22  what I'm asking, if Mr. Meziani wants a transcript as

23  well -- if he wants a transcript, because I'm okay with just

24  filing a brief.

25          THE COURT:  Okay.

 1              MR. MEZIANI:  Well, we can argue it today right

 2   now after a break or we can go back and file a brief.  If

 3   we're going to be filing a brief, then yes, I think we need

 4   a transcript.

 5              THE COURT:  So I'm trying to think.  When is the

 6   trial set?

 7              MR. YOUNG:  In March, Your Honor.

 8              THE COURT:  Okay.  So I think we have time.

 9              Ms. Walker, I don't know what your schedule is.

10              THE COURT REPORTER:  I can get it out in two

11   weeks.

12              THE COURT:  Two weeks.  So assuming that

13   Ms. Walker gets this done in two weeks, how long will it

14   take you?

15              MR. YOUNG:  Your Honor, unfortunately, I've got a

16   kidnapping trial that begins on January 5th.  It should be

17   about a week.  So it would be a little bit hard -- if you're

18   waiting for the transcript, it would be a little bit hard to

19   get the transcript and then try to file something right as

20   that is happening.  That's my only issue.

21              So if we could say something like January 15th.

22              THE COURT:  Okay.  And I'm assuming you can do a

23   lot of the work, and then when you get the transcript -- so

24   should we say January 15th?

25              MR. YOUNG:  You know what?  You're right,

1     Your Honor.  I'm fine with -- I'll get it done during the
2     trial.  So if we can get it -- if it comes within two weeks,
3     so that would be --
4               THE COURT:  I don't want to ruin your Christmas
5     holiday.
6               MR. YOUNG:  My Christmas is already ruined with
7     that trial, Your Honor.
8               THE COURT:  Well, but we could make it worse or we
9     could try not to make it worse.
10              MR. YOUNG:  Let's January 15th is fine.
11              THE COURT:  And then, Mr. Meziani, can you respond
12    within ten days?
13              I know you have other trials because I'm aware of
14    some of them that are on my docket.
15              MR. MEZIANI:  I'm in a wonderful FedEx fraud trial
16    that starts January 22nd.  But I will file this -- I can't
17    do it during the trial, but I'll do it --
18              THE COURT:  Well, let me ask you this.  Would you
19    rather just argue today?
20              MR. YOUNG:  I'm fine either way, Your Honor.
21              THE COURT:  I'll defer to you, counsel.  I mean if
22    you both think that it makes sense to do this now while
23    everything is fresh on your mind, we can do that, and then
24    that won't interfere with your other upcoming trials.
25              Are we good with that?

1            MR. MEZIANI:  Why don't we just -- I'm fine to

2   argue it today.

3            THE COURT:  Mr. Young, are you fine to argue it

4   today?

5            MR. YOUNG:  I'm great.

6            THE COURT:  Okay.  Let's take a 15-minute break.

7   We'll come back at 3:15 and have argument.

8            MR. YOUNG:  Thank you.

9            (Recess)

10            THE COURT:  All right.  Mr. Young, you may

11   proceed.

12            MR. YOUNG:  Thank you, Your Honor.

13            Thank you, Your Honor.

14            Your Honor is well aware of Rule 702.  It has

15   changed slightly in that --

16            THE COURT:  We're not supposed to nitpick.

17            MR. YOUNG:  We're not supposed to nitpick.  That's

18   a fair way to put it, absolutely.

19            The proponent has to demonstrate to the Court that

20   it's more likely than not, and then it talks about kind of

21   the four, essentially, kind of prongs or points that we have

22   to look at.  So let's look at each one of these points in

23   turn.

24            The expert's scientific, technical, or other

25   specialized knowledge will help the trier of fact to

1   understand the evidence or to determine a fact in issue.

2         So looking at that, Mr. Eze -- I'm saying it

3   right, Eze?  Thank you.  Mr. Eze, you know, he is engaged as

4   a lawyer.  He's also engaged as a founder for essentially a

5   money transmission business.

6         THE COURT:  He's also, I think, and tell me if

7   this is not legitimate, he also was born in Nigeria.  He's

8   lived in the United States.  He's personally transmitted

9   money back and forth and is aware of a need in those

10  communities.  I think it's easy to look at technical and

11  scientific experience, but does the rule not also allow for

12  cultural and -- I don't know the best way to describe it,

13  but essentially being immersed in a community and talking

14  about what the level of knowledge and the practices that are

15  common in the community.

16        MR. YOUNG:  Absolutely, Your Honor.  And I don't

17  want to -- this is really not the prong that I'm going to

18  die on in terms of those things, but I do think it's

19  important to kind of talk through some of those things, and

20  whatnot.

21        Yes, Mr. Eze is Nigerian.  He has experience with

22  both the American and Nigerian, you know, money businesses,

23  and whatnot.  He has, in fact, founded his own, and, you

24  know, saw a need, and, you know, provided that need.

25        Now I think it's also important to note that in

1    terms of actual -- you know, actually what that has done,

2    $200,000 last year, which is helpful, pales in comparison to

3    the defendant's in this case.  I mean we're not even in a

4    realm of -- my sense is we're at least a factor of 5 or 6x

5    for the defendant as compared with Mr. Eze's legitimate

6    money transmitting business.

7            Additionally, in terms of his -- what I will call

8    his specialized knowledge, I would say there's an extensive

9    amount that's lacking.

10           Now Mr. Meziani will likely indicate that with,

11   say, drug valuation experts or with drug distribution

12   experts -- because this is the example he keeps using with

13   me when we talk about this case -- that, you know, a

14   valuation expert or a distribution type expert can indicate,

15   hey, this amount of drugs appears to indicate an amount

16   intended for distribution, not an amount intended for what

17   we'll call, you know, personal use, right?  That's one of

18   the things that we have to --

19           THE COURT:  Right.  In fact, don't we have law

20   enforcement officers routinely testify based on their case

21   work what the threshold is?

22           MR. YOUNG:  A hundred percent, Your Honor,

23   absolutely.  And, in fact, what those officers do is they

24   talk to the bad guys.

25           THE COURT:  Well, I don't know.  I was recently

1  the victim of a Zelle scam.  I understand how the scam

2  worked, and I had talked to the perpetrator.  I didn't talk

3  to the bad guy.  But as a victim I understand what happened.

4       MR. YOUNG:  And if we were putting you on the

5  stand as an expert on victims, that would make a lot of

6  sense.  But if we're putting you the stand as an expert on

7  these types of cases, I'm not sure that you being a victim

8  of one case would indicate you could opine as an expert on

9  all of this stuff.

10      THE COURT:  I think I'd agree with you.  But if,

11 as a lawyer, he met with a hundred victims of Zelle scams, I

12 would think he may have a basis for testifying as to how

13 those scams work because he would see the patterns that

14 arose based on the description of the scams by a hundred

15 victims.

16      MR. YOUNG:  Absolutely.  And yet I didn't hear any

17 of that from his testimony.  Here's what I did hear.  I have

18 represented seven people who were either part of the scam or

19 maybe a victim of the scam.  I represented three people who

20 were actually, apparently, a victim of the scam.  I've

21 talked to lots of people.  But I never heard numbers.

22      THE COURT:  I think he testified that he's

23 continuously within his community approached by people.

24 He's hearing reports on the street from the two folks who

25 have been on the street for a year in Lagos trying to figure

1    out how all of this works.

2              MR. YOUNG:  He's been on a WhatsApp with 20 of his

3    first cousins, 48 of his second cousins, WhatsApp with 500

4    people in -- you know, from his elementary school on up.

5    Your Honor, if that makes an expert, my daughter is an

6    expert on K-pop and can testify as a 14-year-old.

7              There's enough there -- again, this isn't the

8    prong that I think we're at.  But in terms of the sufficient

9    facts and data, I don't think we're there at all.

10             In terms of -- he's been practicing for 15 years

11   and has only represented seven people in these types of

12   cases.  I've done hundreds of cases in 15 years.  Now

13   granted, I'm a professional criminal prosecutor.  But at the

14   same time, if we're going to put an expert on the stand,

15   this isn't -- you know, he has not hit the sufficient basis

16   at all.  It's all anecdotal.  It's all anecdotal except

17   for --

18             THE COURT:  And part of the, I guess, difficulty,

19   Mr. Young, is that depending on the kind of expert, some

20   practical experience is, by definition, less formal and more

21   anecdotal, and enough anecdotal experience may lead to a

22   sufficient qualification.

23             MR. YOUNG:  And I understand that.  And I'm not

24   quibbling that.  But, again, at the point -- do I think that

25   he could probably say -- and let me find it -- there's a

1   legitimate parallel market for sending funds to Nigeria?

2   That's from page two.  That's opinion number one.

3              THE COURT:  Do you contest that opinion?

4              MR. YOUNG:  Well, legitimate, I think, is a loaded

5   word.

6              THE COURT:  Okay.  Well, what if he simply says

7   there's a large parallel market for sending funds from

8   Nigeria to the U.S. and back?

9              MR. YOUNG:  Again, that probably would actually be

10  fine.  I'm not sure how it is relevant to this case and how

11  it helps the jury understand the evidence or determine a

12  fact in issue.

13             But yes, if there is, you know, something like

14  that, he clearly has experience with the Nigerian market,

15  right?  And so he clearly can say, yeah, there is this other

16  parallel market.  Saying it's legitimate, especially when

17  we're talking about hawalas and stuff -- like it's not a

18  legitimate market in terms of transferring money through --

19  you know, from the United States.  But it is there.  And I

20  think that's fine.  But that's not going to help the jury

21  understand anything as to whether this defendant, you know,

22  was engaged in money laundering or not.

23             Let's talk about opinion number two where

24  criminals in Nigeria exploit this parallel market.  Again,

25  you know, criminals do lots of different things.  I'm not

1   sure why we need an expert to come in and say this market is

2   specifically, you know, exploitable by criminals.  Every

3   market is exploitable by criminals.  How is this an expert

4   opinion?

5         And then moving on, innocent money mules use their

6   own names and accounts.  I'm sorry, but his testimony on

7   that one was a little bit all over the place.  You cannot

8   say -- I have ten fraud defendants right now who engaged in

9   fraud who used their own -- you know, their own bank

10   accounts.  And for him not to make that concession, that's

11   surprising.

12         THE COURT:  Well, I think he did say it's all a

13   case by case.

14         MR. YOUNG:  Okay.  At the end he did say case by

15   case, but that's not what his opinion says.

16         And looking at opinion number four, that's just

17   definitely a bridge too far.  The facts and circumstances of

18   this case are consistent with Uchendu acting as an innocent

19   money mule.  You know, essentially he will -- if you put

20   this expert on and he makes that opinion, he's testifying as

21   to the ultimate -- the ultimate issue as to money laundering

22   at least.

23         THE COURT:  Hasn't the Tenth Circuit, I don't

24   know, in drug cases, for example, allowed expert testimony

25   that somebody's behavior was consistent with drug dealing,

1    for example?

2           MR. YOUNG:  Actually what they talk about there is

3    these tools are an indicia of drug dealing.  So baggies and

4    a money -- you know -- you know, baggies and a scale, and

5    this amount of drugs, you know, is indicative of, you know,

6    possession with intent to distribute.  Not that -- not that

7    it goes to the ultimate issue that this defendant was an --

8    you know, was a drug dealer.  That's different than what

9    this opinion says.

10          THE COURT:  All right.  Well, what if the opinion

11   is -- and I think this was in there somewhere as well --

12   using an account in your own name is one possible indicia of

13   being an innocent mule?

14          MR. YOUNG:  As long as he can also say using an

15   account that's in your own name is one indicia of,

16   potentially, criminal behavior.  You know, I don't think

17   he -- I don't think he gets to say that without also

18   acknowledging that it is very possible.

19          THE COURT:  Isn't that what you get out on cross?

20          MR. YOUNG:  But why do we even have to go to cross

21   if this is an improper expert?

22          I mean if we -- and not to get to the bias issue,

23   Your Honor, but if we had a -- if we had a different

24   ethnicity and we were talking about this, there would be

25   some likely issues.

1          If we had a Mexican defendant who is talking about

2     how things are done in Mexico, that would be very

3     concerning.  And because this is Nigeria, we're allowing

4     somebody to come in to talk about, you know, the different

5     culture.

6          And, you know, it's one thing -- and I've

7     already -- I offered to, you know, potentially stipulate to,

8     hey, Nigeria has a different system of, you know, money

9     transmitting and there is this parallel market.  And

10    Mr. Meziani wants all this other stuff.  That's just a

11    bridge too far.

12         I mean the testimony is not based on sufficient

13    facts or data.  You know, he's not -- at least with the drug

14    example, the agents are actually interviewing lots and lots

15    of drug dealers and users, you know, to know, okay -- and

16    the best example is, you know, talking about a possession

17    with intent case.  Okay, what is the average amount a user

18    uses?  Well, they actually have sufficient data on that.

19    How?  Because for years they've been interviewing people

20    about their own drug use, and they've also been

21    interviewing, interrogating, you know, other defendants

22    about that as well.  You actually -- at least you have some

23    kind of, you know, sufficient facts or data to rely upon.

24         Here, Mr. Eze doesn't even know half of the

25    stuff -- like half the information that he got in terms of,

1   you know, the 24 billion that's in the parallel market, he's

2   like, yeah, I got this report.  I paid for it.  Great.  What

3   does the report say?  Well, I don't have it.  I don't

4   remember.  I didn't provide it to Mr. Meziani so he could

5   provide it to us.

6          We asked for all the Jencks information, and he

7   never provided us anything.  So like there's -- so we don't

8   even know what the basis for that 24 billion itself is.

9          Mr. Eze also talked about, well, you know, I have

10  a team in Lagos, and the team in Lagos is engaging in all of

11  this.  That's great.  When you frill down, it's two people,

12  they're college educated, with no formal training.  Sounds

13  like he gets reports.  They might be oral.  They might be

14  written.  Again, we have no knowledge or basis of all of

15  that underlying information that he apparently relies upon.

16         At least with agents you can say, okay, what kind

17  of training have you had?  Well, I've gone to this training

18  and this training and this training and this training.

19  Okay, great.  How many cases have you run?  I've run 150

20  cases.

21         THE COURT:  And of course that quantity of

22  caseload and that level of involvement is something that is

23  only going to be found in a government agent.  I mean are we

24  trying to create a monopoly here so that only government

25  agents employed by the FBI have the sufficient experience to

1    be qualified as experts?

2         MR. YOUNG:  No, Your Honor.  And in terms of --

3    I'm trying to think of the best way to put this.  In terms

4    of Mr. Eze, he clearly has knowledge.  Does he have

5    knowledge to provide -- is it based on sufficient facts and

6    data?  It's anecdotal at best, and we just don't even

7    understand the basis.  It's very fruffy, for lack of a

8    better word.

9         And in terms of whether this testimony is the

10   product of reliable principles and methods, again, he's

11   basically stating these things without talking about -- I

12   mean he talked about this one case, Lisa.  And that's on his

13   website too.  I mean I watched all his videos.  I'd read all

14   his articles.  You know, it's essentially kind of, hey, this

15   happens sometimes, watch out.  That's all it is.

16        In terms of the expert's opinion reflects a

17   reliable application of the principles and methods of this

18   case, again, I'm not seeing any kind of methods.  He didn't

19   even know -- I'm trying to think if -- you know, he said

20   he'd reviewed the material, but he had not really -- he

21   didn't really know the facts of this case.

22        We talked about other co-conspirators.  You know,

23   he's just kind of not really in the details or in the weeds,

24   which is fine.  That's totally fine.  But that's not fine

25   for an expert.  If we're going to put an expert on in a case

1    like this in federal court --

2            THE COURT:  I mean to some degree, though, he's

3    providing, I think, contextual information to contextualize

4    what's happening for the jury.  You now say, well, he's not

5    down in the weeds.  But if he were to get down in the weeds,

6    then I think we'd hear an objection that he couldn't be

7    opining as to this particular defendant's guilt or innocence

8    because he's too far down in the weeds.

9            MR. YOUNG:  I'm not talking about the weeds on

10   that.  I'm talking about the weeds on -- I mean in terms

11   of -- basically what this expert is trying to say is that

12   this defendant is not guilty.  As we know, we can't get

13   there.  That's not what an expert is supposed to do.  Okay.

14           Can he say, yeah, the Nigerian system has a

15   different system -- you know, has a parallel market?  Sure.

16   Can he say it's legitimate?  No.  Can he say anything in

17   two, three, or four?  I don't think so.  I mean innocent

18   money mules use their own names and accounts.  Sure.  And so

19   do non-innocent money mules.  And, again, it's like pulling

20   teeth trying to get that out of him.

21           The facts and circumstances of this case, like

22   trying to indicate that Mr. Uchendu, after he's spent an

23   hour and 15 minutes with him -- you know, he indicates,

24   yeah, this is consistent with an innocent money mule.

25   Again, it just goes to the ultimate question, you know, and

 1    that's for the jury to decide.

 2              So in terms of this expert, I don't believe we've

 3    hit anything that we need, you know, the sufficient facts or

 4    data.

 5              THE COURT:  Okay.  I suppose we start out with

 6    four opinions.  It sounds like you're maybe agreeing that

 7    part of opinion one, if we get rid of the term legitimate,

 8    may come in, and you're objecting to opinions two, three,

 9    and four?

10              MR. YOUNG:  Absolutely.

11              THE COURT:  Okay.  And we've talked about

12    specialized knowledge and facts.  Are there other 702 prongs

13    that you want to talk about as they relate to two, three,

14    and four?

15              MR. YOUNG:  Sure.  I've talked about reliable

16    principles -- you know, I've talked about this not being a

17    product of reliable principles and methods.  There's no

18    principles and there's no methods.  Again, it's anecdotal.

19    I heard from a guy who heard from a guy this happened.  I

20    have gotten a bunch of calls from people maybe telling the

21    truth, maybe not, who say they've been scammed.  I mean

22    that's it.  You know, and I've represented seven people in

23    15 years.  That's just not -- you know, it's not sufficient

24    facts or data.  And his opinion is not the product of any

25    kind of reliable principles and methods.

1          You know, I didn't -- there's no unifying theme

2     here.  Look, I looked at this case and, you know, based on

3     this, this, this, this, and this, you know, I came up with

4     this opinion.  Again, it's about Lisa and a car dealer, and

5     other things.  That's just not expert opinion.  That's

6     anecdotes.

7          And, finally, again, I don't think there's a

8     reliable application of principles and methods to the facts

9     of this case because there is no essential application of --

10    there's no principles and methods to begin with.

11         So that's where I'm at, Your Honor.  I'm happy to

12    sit down and let Mr. Meziani take his chance.

13              THE COURT:  Thank you, Mr. Young.

14              MR. YOUNG:  Thank you.

15              THE COURT:  Mr. Meziani.

16              MR. MEZIANI:  Thank you.

17         Rule 702 puts the burden on me to convince the

18    Court that it's more likely than not that the witness

19    qualified, meets the elements that I think are important in

20    this case, knowledge and experience.  And this is a

21    knowledge and experience case.  And I think sometimes, in at

22    least legal culture, there's this conception that you have

23    to be a Ph.D. and it's scientific.  But it's not.  You can

24    have an expert, under the federal rules, be qualified by

25    knowledge and experience.  That's really what we have here.

1              We have someone who is Nigerian.  We have someone

2      who owns this business.  We have someone who's a lawyer and

3      an accountant, and an advisor in his community.  Why are all

4      those things important?  Those things are pivotal -- pivotal

5      in this case because they're helpful.  And the reason

6      they're helpful is they explain everything that happened

7      here.  They put this in context.  All those facts and his

8      experience put this in context, because when the jury hears

9      that someone named Ken asked someone to send money, that

10     makes no sense to me.  That makes no sense to an American.

11     That makes no sense.

12             Why would you -- this guy wants you to send money

13     for him?  That doesn't make any sense.  And if we come into

14     trial, every juror is going to think that.  None of those

15     jurors have ever been asked to transfer money for someone

16     else, because they're not in the same world as these people.

17     It doesn't make any sense.

18             And so what I have to do to give my client a

19     constitutionally sufficient defense is say what are the

20     facts and circumstances, what was the water he was swimming

21     in that explains when he heard this why it made sense to

22     him.  So that's why I have to do this, and I think we need

23     an expert to provide that experience.  I can't really

24     imagine anyone who's more qualified than that.

25             If the homework assignment was go out and find

1    someone who knows about law, who knows about accounting, who

2    knows about international financial transactions, who knows

3    about how those work in Nigeria, who knows how family and

4    friends transfer money to Nigeria, I really can't imagine

5    anyone better.

6          I mean I think if you had an FBI agent who was

7    stationed in Lagos is stationed here, and who was embedded

8    as much of him, maybe.  But I think that really he is the

9    most qualified on that point.

10         So we have qualifications.  We have really someone

11   who is answering the most pivotal question that I really

12   need to provide a defense in this case, which is giving the

13   context and explaining why all these things that Ken told

14   him made sense to him.

15         So going through the various prongs, I think I

16   just talked about (a), that specialized knowledge will help

17   the jury understand the evidence -- help the jury understand

18   the evidence.  It's help for 702(a).  The jury will

19   understand all these chats and all these communications that

20   I can't read -- that are very difficult to read.  He can

21   help the jury understand why that makes sense to my client.

22         Based on sufficient facts or data, the government

23   spent a lot of time on that, and I guess that word can mean

24   a lot of different things.  I mean if we're talking about --

25   you know, if we're talking about a Roundup case and whether

1   it causes cancer, whether that theory is based on sufficient

2   facts or data in a pharmaceutical case, that's going to be

3   one thing.  I mean that's one type of case.

4         Here his opinion that people send money back and

5   forth is certainly based on sufficient facts or data.

6         THE COURT:  I can't quite put my finger on it, but

7   it's reminiscent of a case I had maybe, I don't know, 15, 20

8   years ago when I was on the Utah Supreme Court, and it was a

9   medical malpractice case involving a kid who stuck a bean up

10  his nose, and the plaintiff had some doctor who just said

11  the way the doctor in the InstaCare tried to pull the bean

12  out of the nose was not appropriate, I suppose, for lack a

13  better term.  And the objection came in, well, what's the

14  data, what's the facts?  And at the end of the day it wasn't

15  a case that called for facts and data because it was just a

16  question of pulling a bean out of a nose.

17        And so I guess what I'm struggling with here is is

18  this a case that requires data as we think of data, you

19  know, studies, a hundred different things, or is this just a

20  case that's relying on experience and knowledge that can't

21  be reduced to data?

22        MR. MEZIANI:  I think it's the latter, and I think

23  that, B, when it's talking about facts, has to be viewed in

24  that context, which are what are the facts supporting his

25  experience.  And the facts are that he is aware of all these

1    transactions.  The transactions are legitimate in the sense

2    that they happen.  That's how it's done.  So I think

3    there's -- are there sufficient facts for him to say this is

4    how it's done?  I think we've shown that, yes.

5              THE COURT:  I have to say, one concern that I have

6    is the use of this term legitimate, because we certainly

7    can't have lawyers testifying as to the law and what's legal

8    and what's not legal.  That's the province of jury

9    instructions, is it not?

10             MR. MEZIANI:  I agree.  And I think that's

11   something that I learned and it came out during the briefing

12   process.  And now that I understand the government's

13   objection, and I think I asked them about it as well, is I'm

14   not -- I agree.  He can't -- for example, if there's money

15   licensing regulations in the states or federal -- you know,

16   we briefed that issue -- he's not going to say whether or

17   not these transactions comply or do not comply with that.

18   I'm not trying to have him render a legal opinion that

19   they're legitimate in the sense that they comply with all

20   the laws.

21             What I'm really trying to say -- and I use that

22   word, but now I understand the objection, but what I'm

23   really trying to say is this happens with regularity, with

24   regular people who are not involved in dating scams, meaning

25   you can have multi chain transactions with multiple people

1    that aren't romance scams.

2          THE COURT:  That aren't trying to take someone

3    else's money?

4          MR. MEZIANI:  Yes.  Yes.  They can be like Mr. Eze

5    pays for people in his family, or buying land, or buying,

6    you know, a car.  All these transactions he talked about, it

7    can be for those types of transactions.  And we can have a

8    limiting instruction.  I'll be cognizant of it.  I'm not

9    going to -- I don't need to do that.  I don't even want to

10   do that.

11         So I'm not trying to have this labeled everything

12   that ever happens with this Nigerian community is

13   legitimate.  I don't care.  I don't need to prove that case.

14   All I need to show is that these things happen and, in large

15   part, they're non-criminal, because that's what sounds so

16   strange to a jury.

17         Again, I've got a big hurdle in this case because

18   it's just the stigma around it.  I mean Mr. Eze talked about

19   it.  That's the reason why he has the company.  There's a

20   stigma, and I need to explain why that makes sense to my

21   client, because that's the truth.  That's what really

22   happened.  It made sense to him because they engage in these

23   transactions.

24         So to answer your question and to put a point on

25   it, legitimate -- I won't use the word legitimate.  But what

1   I really want to do is just explain that there are informal

2   transactions that are non-nefarious or not expressly for the

3   purpose of moving romance scam or other scam money.  That's

4   all I'm trying to say.

5          The second opinion, that criminals exploit that.

6   That's our position here, is that that's what happened here.

7   You know, I don't know why the government is saying that

8   that's not a valid opinion.  You think they would agree that

9   there's criminals that prey on other people.  You know, that

10  seems to me to be something that's established.  And I think

11  it is established because of his legal practice, of the fact

12  that -- I mean he owns a company.  So he talked about all

13  the licensing he has.  He talked about registering it with

14  the federal agency that I don't recall the name of.

15          MR. YOUNG:  FinCEN.

16          MR. MEZIANI:  FinCEN.  Thank you.

17          I mean he's got to comply with anti-money

18  laundering rules -- he talks about that on his website --

19  that he's got obligations to.  That's a highly regulated

20  business.  If you're going to engage in the business of

21  international financial transfers, you should know something

22  about money laundering.  And I think that the fact that he

23  has this business, the fact he's had these cases, the fact

24  that he's a community leader and is involved in this is

25  enough for him to say, you know what?  There's a risk that

1    some of this money could be bad.

2         I think he's very conscientious and aware in

3    saying some of this money out there that's coming through

4    this could be bad.  That doesn't seem to me to be an

5    objectionable, out there conclusion.  That seems to me to be

6    based on sufficient facts or data.

7         Opinion three really is folded into opinion four,

8    and really the genesis of all this is I first contacted

9    Mr. Eze to say I need someone to explain this informal

10   market.  I heard about it in another Nigerian case that I

11   had in this court.  And when it came up again, I thought I

12   need to understand this issue better.  So I talked to him

13   about it.  And, you know, one thing that he made very clear

14   was he was not going to help me if he thought my client was,

15   you know, a fraudster.  So he really wanted to look at it.

16        And opinion three, as the Court said, it's just an

17   indicia.  It's not a math equation of there can never be

18   fraud if someone uses their own account.  But it really does

19   explain the evidence that when people are involved in these

20   transactions, they use other people.

21        That's exactly what happened in this case.  Why

22   would this Ken person, why wouldn't he just transfer the

23   money on his own?  Why did he even -- even assuming the

24   government's theory is correct, because he's trying to

25   conceal the proceeds, he's trying to use different

1    transactions, and even under the government's theory, the

2    reason these people enlist other people is because they're

3    trying to have various steps in the process.  That's money

4    laundering.

5          THE COURT:  Well, at the end of the day doesn't it

6    just come down to what your client knew?  I mean to whether

7    or not your client thought that he was involved in a

8    legitimate transaction or whether he realized that he was

9    just a step for a scammer?

10          MR. MEZIANI:  That's the entire case.  And I think

11   this is helpful to the trier of fact because it explains the

12   prior fact that someone in his shoes, call him Clinton

13   Uchendu, or anyone else, someone who shows up in this type

14   of arrangement, in this type of financial arrangement where

15   you have multiple steps, that's the model of what happened

16   here.

17          And I don't want to summarize all the government's

18   evidence, we have this poor innocent victim who fell for

19   this romance scam by this man in Nigeria who knowingly stole

20   her retirement proceeds -- and it's horrible -- by putting

21   up all those doctored, fake, crazy dating profile pictures

22   that look obnoxious to anyone.  I mean it's obviously fraud

23   and this poor woman loses her money, and they send it

24   through various channels, but it helps explain why someone

25   in my client's position would not be aware.

1          That's why the opinion is important, because he's

2    saying these scammers use innocent people to help transfer

3    the funds, and he's aware of all those scams based on being

4    in that community, and being a lawyer.  He knows about them.

5    So he's able to say that.

6          But to answer the Court's question, yes, that's

7    the question in this case, and this expert's opinion is

8    helpful to that.

9          Now there's a lot of argument about what's

10   appropriate for an expert to say.  And it's really -- I put

11   in my brief it's a 704 issue.  Obviously Mr. Eze can't --

12   and he won't, and I won't ask him to.  He can't say what

13   Mr. Uchendu believed or didn't believe.  All he can say is

14   it's consistent with.  And the reason I use that word

15   consistent with, that's really all the drug cases where the

16   Tenth Circuit says, yeah, you can't say this person knew, or

17   he was drug dealing or not drug dealing.  You can say this

18   activity, this model, these facts in the world are

19   consistent with that.

20         That's what I'm saying.  I'm saying these facts --

21   Mr. Eze is saying, excuse me, is these facts, these

22   financial arrangements are consistent with that.  So that's

23   why it works.

24         And really the question is it's a 704(b), and I'm

25   reading from the Tenth Circuit case U.S. v. Goodman, 633

F.3d 963, and it's talking about 704(b), and here's why it's

important.  It provides a lot of latitude.  It says as we

have explained, Rule 704(b) only prevents experts from

expressly stating a final conclusion or inference as to a

defendant's mental state.  The rule does not prevent the

expert from testifying to facts or opinions from which the

jury could conclude or infer that the defendant had the

requisite mental state.

           And they cited a D.C. Circuit case that says, it

is the only -- excuse me.  Let me start over.  They're

citing this D.C. Circuit case.  It is only as to that last

step in the inferential process, a conclusion as to the

defendant's actual mental state, that Rule 704(b) commands

the expert to be silent.

           And that's what we'll do.  I'm not going to ask

him to say what did Mr. Uchendu believe.  All I'm saying is

one thing I would ask him to say is is it consistent with.

That's all I would be asking him to say right from those

Tenth Circuit cases.

           THE COURT:  And you wouldn't be asking, as I

understand him to say, anything about his intent or his mens

rea?  You would just be saying that the objective facts as

to what happened are consistent with this parallel money

transfer market?

           MR. MEZIANI:  Exactly.  I mean our defense is he

1    was a victim, a knowing participant.  And Mr. Eze, based on

2    his experience and knowledge of these scams, and in-depth

3    connections to the community, knowing how these things work,

4    can say, yes, some people are victims and some aren't.  And

5    I don't see anything in this fact pattern that shows

6    Mr. Uchendu was anything but a victim.

7            And the government can put on all its evidence and

8    say, well, he must have known, he should have known, and

9    everything else.  But all Mr. Eze is going to say is I don't

10   see anything in these facts that's inconsistent with the

11   statement that he's a victim, based on all my knowledge and

12   experience.

13           And I guess, just to summarize, and I've been

14   repeating myself, again, he's just very important to have

15   context.  And I think if you don't have the context of this

16   expert in this case, none of the evidence will make sense

17   and it will really be just unfair because it will just be

18   overwhelming and you won't be able to provide the context.

19           Mr. Uchendu can talk about it, and we think he is

20   going to testify in this case.  That's one reason we talked

21   to an expert.  But if we don't have context of someone who

22   knows what they're talking about -- I mean he's one expert.

23   We're going to have two witnesses really.  So I think he's

24   very helpful to the trier of fact.

25           This isn't a bean up the nose case in some ways.

It's not, you know, the pharmaceutical, you know, based on

years of research.  It's not what this case is.  We can't

look at it that way.  If we look at it as will Mr. Eze

contribute to this trial, will he help the jury understand,

then I think the answer is yes and I think that his

experience and everything he's done in his life is enough

for him to be able to say that.

THE COURT:  Thank you, Mr. Meziani.

You may reply, Mr. Young.

MR. YOUNG:  Thank you, Your Honor.

Expert witnesses aren't about contributing.  It's

about whether or not -- whether it's more likely than not

this knowledge will help the trier of fact to understand the

evidence or determine a fact in issue.

In terms of what Mr. Meziani has talked about,

especially opinion number three and opinion number four, a

clear argument.  And especially if Mr. Uchendu doesn't

testify, none of this should come in.  I think that's

actually a baseline.  You know, even opinion number one

shouldn't come in unless Mr. Uchendu is on the stand first.

Now Mr. Meziani talked about how Mr. Eze can -- he

can make the jury understand the chats.  In this notice, I

only have -- there's only two chats he talks about.  Not the

entire context of all the chats, at least in this notice.

So I'm not aware that Mr. Eze is going to opine on, you

1    know, helping the jury understand all the different chats.

2    Just those two.

3           MR. MEZIANI:  I don't want to interrupt, but there

4    were chats that came in.  I think Mr. LeSueur will -- there

5    were chats that came in after this disclosure, and we bumped

6    the trial and everything.

7           MR. YOUNG:  And I haven't gotten an updated

8    disclosure, so I'm only aware of these two chats.

9           THE COURT:  Well, and it may be.  It is true that

10   there was evidence that came in when we were having the

11   hearing -- or around the time we had the initial hearing on

12   this motion.  So obviously we probably need to set a date

13   for any updated disclosures.

14          MR. YOUNG:  Additionally, Mr. Meziani -- and I'm

15   quoting here, but in large part they are non-criminal.  He's

16   talking about the parallel transaction markets.  Mr. Eze

17   can't say that.  I actually asked him, you know, the

18   $24 billion in the parallel market, how much of it is

19   legitimate, you know, according to you?  How much of it is

20   legitimate or not?  No idea.

21          Now I mean he can opine.  He can say, well, I

22   think it's -- you know, I think they're in large part, you

23   know, legitimate.  But there's no data.  There's no, you

24   know -- I mean that's the problem, again, I have with

25   Mr. Eze as an expert.  Him saying there is this other

1    parallel market, fair enough, fine.  Him saying anything

2    else in here, I just don't think we get there.

3           So I'll leave it at that, unless there's further

4    questions.  Thank you.

5           THE COURT:  All right.  Thank you, Mr. Young.

6           I appreciate the argument, counsel.  I will take

7    this under advisement and issue a written opinion.

8           Mr. Meziani, if there are any supplemental

9    opinions that you intend for this expert to offer based on

10   recently disclosed additional chats, when can you give us a

11   supplemental disclosure?

12          MR. MEZIANI:  I'm sorry.  I'm just thinking this

13   through.

14          THE COURT:  I know you all have terrible trial

15   schedules.  I don't know if you have anything else.  Maybe

16   it's better to --

17          MR. MEZIANI:  I can do it in a couple weeks.

18          THE COURT:  Okay.  Let's do that within a couple

19   weeks if you're going to do it just so that there aren't any

20   surprises at trial.

21          As I said, I'll take it under advisement.  I'll

22   issue a written ruling with respect to each of the four

23   opinions that are contained in the existing notice.  And

24   then I suppose if something else comes up with respect to

25   any supplemental opinions, we'll sort through that if and

1    when it happens.

2              All right.  Anything else, counsel, that we need

3    to address before we recess?

4              MR. YOUNG:  No.  Thank you, Your Honor.

5              THE COURT:  All right.  Good luck with your busy

6    trial schedules.  I know you're both stacked pretty deep.

7    So hopefully it won't completely ruin your holiday.

8              MR. YOUNG:  It's all part of the job, Your Honor.

9              MR. MEZIANI:  Thank you, Your Honor.

10             (Whereupon, the proceeding was concluded.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4          I hereby certify that the foregoing matter is

5 transcribed from the stenographic notes taken by me and is a

6 true and accurate transcription of the same.

7

8

9

10

11

12

13

14

15

16 PATTI WALKER, CSR-RPR-CP       DATED: 12-28-2023
   Official Court Reporter
17 351 South West Temple, #8.431
   Salt Lake City, Utah  84101
18 385-215-5889

19

20

21

22

23

24

25